IN THE CIRCUIT COURT OF RANDOLPH COUNTY, ALABAMA

MICHAEL D. MAY,                    )
                                   )
Plaintiff,                         )
                                   )
vs.                                )     CASE NUMBER: CV-05-_149_
                                   )
MERCK & CO., INC., a foreign or    )
domestic Corporation, ROBERT M.    )
WALL, GARY HARLAN, HAL             )
HENDERSON, STEVE SANTOS,           )
PATRICIA AIKEN, MATTHEW KING,      )
ANGELA FINCH, SONYA COLEY,         )
JASON DELK, and the                )
Defendants A, B, C, D, E, X & Z whether )
singular or plural, being those persons, )
firms or entities who or which     )
proximately caused or contributed to the )
Plaintiff's personal injury and Plaintiff's )
other harm and the other           )
damages as complained of herein whose )
true names are unknown to the Plaintiff )
but will be added by amendment when )
correctly ascertained,             )
                                   )
Defendants.                        )

**COMPLAINT**

**Filed in Office**

SEP 1 5 2005

**KIM S. BENEFIELD**
Clerk of Circuit Court

NOW COMES Michael D. May, the Plaintiff, and states his claims for relief against

defendants Merck & Co., Inc., a Corporation (hereinafter generally referred to as Merck), Merck

Corporation, a trade name or division of Merck & Co., Inc., Robert M. Wall, Gary Harlan, Hal

Henderson, Steve Santos, Patricia Aiken, Matthew King, Angela Finch, Sonya Coley, Jason Delk,

Defendants A, B, C, D, E and F, and X and Z, whether singular or plural, being those persons, firms

or entities who or which proximately caused or contributed to the Plaintiff's personal injury and the

other damages as complained of herein whose true names are unknown to the Plaintiff but will be

added by amendment when correctly ascertained, with the claims being as follows:

## GENERAL AND JURISDICTIONAL ALLEGATIONS

1.    Plaintiff, Michael D. May, is a resident citizen of the State of Alabama and of Randolph County. Defendants were severally the marketer, promoter, seller, manufacturer, distributor and entity which did manufacture, create, design, test, label, package, distribute, supply, market, sell, advertise, fail to warn, and otherwise handle and distribute in commerce, the product, Vioxx. Plaintiff is a resident of, and citizen of the state of Alabama and of Randolph County. Each defendant does business in Alabama and in Randolph County, and at all times relevant each sold in Alabama and in Randolph County, the aforementioned drug, or is otherwise subject to this Court's jurisdiction. The defendants do business by agent in this state and county and have caused tortious injury in this state and county by manufacturing and selling a dangerous and defective product. Each defendant, acting directly or by agent, is legally responsible to plaintiff as a consequence of that Defendants' (A) transacting any business in this state, (B) contracting to supply services or goods in this state, (C) causing tortious injury or damage by an act or omission in this state, (D) causing tortious injury or damage in this state by an act or omission outside this state and the defendant regularly does or solicits business, or engages in any other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered in this state, (E) causing injury or damage in this state to a person by breach of warranty expressly or impliedly made in the sale of goods outside this state when the defendant might reasonably have expected such other person to use, consume, or be affected by the goods in this state, and the defendant also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state, and otherwise had or has some minimum contacts with this state and, under the circumstances, it is fair and reasonable to require the defendant to come to this state to defend an action. The amount in controversy in this

civil action exceeds the jurisdictional minimum for the Circuit Courts. This Court has jurisdiction hereof both as to the subject matter and in personam.

2.    Plaintiff brings this action against defendants, for such benefits as to which the plaintiff is entitled. Plaintiff also brings this action to recover damages for personal injuries, restitution, refunds, and/or for equitable and declaratory relief against defendants Merck & Co., Inc., a Foreign Corporation, Merck Corporation, a trade name or division of Merck & Co., Inc., and Merck Pharmaceutical Division, a Division of Merck Corporation, (collectively referred to herein as, "Merck" or "Defendants"), which developed, tested, designed, marketed, distributed, promoted and sold Vioxx. The defendants, Robert Wall, Gary Harlin, Hal Henderson, Steve Santos, Patricia Aiken, Angela Finch, Sonya Coley, Jason Delk and Matthew King, are employees of Defendant, Merck and are persons whose conduct is described in more detail elsewhere in this Complaint. These defendants, and other persons whose true names are unknown to the plaintiff, set about to sell and market Vioxx throughout the state of Alabama and in such a manner that their conduct was a substantial proximate cause of the injuries suffered by plaintiff Michael D. May. Defendants A, B, C, D, E, F, X and Z, whether singular or plural, are those persons, firms or entities who or which proximately caused or contributed to the Plaintiff's damages as complained of herein whose true names are unknown to the Plaintiff but will be added by amendment when correctly ascertained. As used in this Complaint, the general word "Defendants" includes, incorporates, and is defined to mean, not only the named Defendants, but also Defendants A, B, C, D, E, F, X and Z, being those persons, firms or entities who or which proximately caused or contributed to the Plaintiff's personal injuries and the other damages as complained of herein whose true names are unknown to the Plaintiff but will be added by amendment when correctly ascertained.

3.    Vioxx has been associated with deaths, including cases of fatal cardiovascular events.

4.    Excess deaths and cardiovascular events, hypertension, edema, kidney damage, aseptic meningitis, and slow healing of bone fractures are also associated with Vioxx.

5.    The relief sought in this action are actions by the court to (1) provide damages for plaintiff's personal injuries, (2) reimburse monies paid for the recalled product, (3) otherwise compensate plaintiff a consumer of Vioxx who has suffered the injuries described elsewhere in this Complaint, (4) to provide other benefits to which the plaintiff is entitled under the laws of the State of Alabama, and (5) the other relief sought in this Complaint.

## PARTIES TO THIS CIVIL ACTION

### PARTY PLAINTIFF

6.    Plaintiff, Michael D. May, is a resident citizen of the State of Alabama and of Randolph County. Plaintiff is a resident of this county who prescribed, purchased and used Vioxx. Plaintiff, Michael D. May, was prescribed and ingested 10 mg of Vioxx regularly since being prescribed the said drug by his physician. Plaintiff suffered personal injuries as a proximate result of the effects of his ingestion of Vioxx. Plaintiff experienced symptoms of Vioxx-induced cardiovascular events, suffered personal injury from the product defect in Vioxx and was at increased risk for developing further complications from such condition all as a proximate result of his ingestion of Vioxx.

7.    Plaintiff is a 56 year old male who was prescribed and who consumed the product at the direction of his physicians in the State of Alabama and in Randolph County.

### PARTIES DEFENDANT

8.    Defendant, Merck & Co., Inc., is a corporation headquartered and with its principal place of business in Whitehouse Station, New Jersey. Merck & Co., Inc. manufactures, marketed and distributed Vioxx throughout the world, including Alabama. Defendants, Robert Wall, Gary Harlin,

Hal Henderson, Steve Santos, Patricia Aiken, Angela Finch, Sonya Coley, Jason Delk and Matthew King, are persons employed by or associated with Defendant, Merck, who are, with other Merck employees, the persons guilty of the conduct, the acts and omissions, specifically described and set forth in detail in this Complaint.

9.    On information and belief defendants Steve Santos, Hal Harrison, Angela Finch, Mathew King and Sonya Conley are residents of the State of Alabama.

10.    Defendant, X is a corporation or other entity organized under the laws of the state of Alabama and having its principal place of business in the state of Alabama. This entity was or acted in concert with the Defendants and is otherwise liable to plaintiff as described herein.

11.    Defendant, Z is a corporation or other entity organized under the laws of a state other than Alabama and having its principal place of business in a state other than Alabama. This entity was or acted in concert with the Defendants and is otherwise liable to plaintiff as described herein.

12.    At all times relevant hereto, Defendants, including Defendants A, B, C, D, E, F, X and Z whose true names are unknown to the Plaintiff but will be added by amendment when correctly ascertained, were engaged in the business of developing, designing, marketing, distributing, promoting, testing, providing warnings concerning, labeling and/or selling the pharmaceutical Vioxx. On information and belief, Defendants Merck Pharmaceutical Division and Merck Corporation otherwise were in control of the development, design, assembly, manufacture, warnings concerning, marketing and with others, the sale of Vioxx. As used in this Complaint, the general word "Defendants" includes, incorporates, and is defined to mean, not only the named Defendants, but also Defendants A, B, C, D, E, F, X and Z, being those persons, firms or entities who or which proximately caused or contributed to the Plaintiff's personal injuries and the other damages as complained of herein whose true names are unknown to the Plaintiff but will be added

by amendment when correctly ascertained.

## JURISDICTION AND VENUE

13.    This Court has general subject matter jurisdiction and in personam jurisdiction on

grounds as shown above.

14.    Venue is proper in this county in that the majority of the defendants reside in this

county.

## FACTUAL ALLEGATIONS

15.    Vioxx, manufactured by Merck & Co., has a demonstrated risk that is or was

misrepresented by Merck and benefits that are exaggerated and oversold to the public and physicians

through an aggressive marketing campaign, while risks are purposefully hidden. Merck has profited

tremendously from its misconduct described in this Complaint. Merck has been, with regard to

Vioxx, over-promoting drugs that are far more expensive than older versions, but no better at

relieving pain.

16.    When Vioxx (Rofecoxib) and Celebrex (Celecoxib), a new kind of pain medication

known as Cox-2 inhibitors, were introduced in 1999, manufacturers and their supporters hailed them

as a kind of "super-aspirin" that lacked the stomach-injuring side effects of the older non steroidal

anti-inflammatory drugs (NSAIDs). But valid questions soon arose about the efficacy and safety of

Cox-2 drugs. Celebrex is discussed herein because of the chemical similarity, and the notice to

Merck provided by Celebrex events. Pharmacia Corp. makes Celebrex, it describes as "a major

advance in the treatment of the debilitating diseases osteoarthritis and rheumatoid arthritis, because

of its efficacy and excellent gastrointestinal safety profile."

17.    The drugs, approved to treat arthritis, menstrual pain and "acute" pain in adults, have

been heavily marketed to both doctors and consumers: Vioxx, which runs ads featuring former

Olympic figure skater Dorothy Hamill, spent over $160 million on consumer advertising in 2000; Celebrex spent almost $80 million, according to AdWatch, the health policy arm of the Henry Kaiser Family Foundation. The campaigns are working: In 2001, Vioxx, the 13th most prescribed drug in the United States, had worldwide sales of $2.6 billion.

18.    Older NSAIDs, such as ibuprofen, naproxen and diclofenac, work by inhibiting the two types of cyclooxygenase enzyme, one of which causes inflammation and thus pain. The Cox-1 enzyme, however, helps maintain the muscle surface of the gastrointestinal (GI) tract, so suppressing the enzyme can increase perforations, ulcers and bleeding. Vioxx, Celebrex and Bextra (valdecoxib, introduced by G.D. Searle & Co. in 2001) suppress only the second enzyme, leaving the first alone to protect the GI tract.

19.    While Vioxx and Celebrex have been marketed as safer than traditional NSAIDs because of their stomach-protecting propensity, reports of serious side effects have begun to emerge. The defendants knew the salient facts concerning their drug long before the discovery of dangers by outside researchers, but ignored or concealed risks and dangers and continued to misrepresent the safety (or lack of safety) of Vioxx. In June 2002, a research team led by A. Whelton noted in a presentation to the European United League Against Rheumatism an increase in hypertension and heart attacks among those taking Vioxx. The medical journal the Lancet published a study associating Vioxx with kidney failure, and other studies have associated both Vioxx and Celebrex with heart problems, kidney damage, aseptic meningitis and slow healing of bone fractures.

20.    A metastudy by the Cleveland Clinic published in the Journal of the American Medical Association analyzed data from two major studies funded by the drug companies and two smaller ones, all for cardiovascular risks. (Debabrata Mukherjee et al., Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors, 286 JAMA 954 (2001).) It found that neither

Pharmacia/Pfizer nor Merck had identified and studied cardiovascular risks for their products. The annualized heart attack rates for patients taking Vioxx or Celebrex, the researchers found, were "significantly higher" than those in a group taking placebos. "The available data raise a cautionary flag about the risk of cardiovascular events with Cox-2 inhibitors," they concluded.

21.    Merck's Vioxx Gastrointestinal Outcomes Research Study (VIGOR) also involved about 8,000 participants and assessed only the drug's effects on the stomach; the company ordered no end-point analyses for effects on the cardiovascular system.

22.    The study concluded that Vioxx takers had a lower rate of GI distress than those taking naproxen. The researchers noted, "the incidence of myocardial infarction was lower among patients in the naproxen group than among those in the rofecoxib group," but found "the overall mortality rate and the rate of death from cardiovascular causes were similar in the two groups." They drew conclusions only about clinical upper gastrointestinal events, bleeding and ulcers. Stroke is caused by Vioxx with the same mechanism as myocardial infarction.

23.    After the VIGOR results were released, the FDA said Merck had minimized the fourfold to fivefold increase in heart attacks among study participants taking Vioxx compared with those taking naproxen. It found the company's explanation that Vioxx did not increase the risk of heart attacks, but instead, naproxen protected those taking it from heart attacks because the drug can thin the blood, like aspirin unacceptable. In a September 2001 warning letter to Merck, the FDA wrote, "You fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation: that Vioxx may have pro-thrombotic properties."

24.    The FDA, which lists Vioxx and Celebrex information on the "Hot Topics" section of its Web site, required both drugs to carry the same stomach-upset and bleeding warnings

ibuprofen and naproxen had when the agency approved them in 1999.

25.    After the CLASS results, the FDA found that Celebrex is just as likely to cause ulcers as older NSAIDs and is no better at reducing pain or inflammation than ibuprofen. In June 2002, it mandated a new label for the drug, one without any claim that it is safer for the stomach than other NSAIDs.

26.    The agency did allow Merck to change its Vioxx label to claim it has a lower risk than older NSAIDs of causing ulcers, gastrointestinal bleeding and other digestive-tract complications.

27.    As early as November 1999, an FDA memo stated that the board monitoring the VIGOR study was concerned about "excess deaths and cardiovascular events experienced in Group A [Vioxx group] compared to Group B [naproxen]." In March 2002, the FDA reported that five people taking Vioxx had aseptic meningitis, an inflammation of membranes on the brain and spine. In April 2002, after the agency warned Merck that it had misrepresented the drug's safety and minimized potentially serious cardiovascular complications found in VIGOR, it required the company to include a warning of cardiovascular risks on the Vioxx label.

28.    The new warnings contain information long held by Merck, but concealed from consumers and their physicians. The new warnings include:

29.    "In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 m g twice daily (n=19)." ...

30.    "In a placebo-controlled database derived from 2 studies with a total 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075 with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was

21 vs. 35 for patients treated with VIOXX (rofecoxib tablets and oral suspension) 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs. 3 for VIOXX versus placebo, respectively."

31.    The prestigious New England Journal of Medicine stated in regard to "the implications of these observations with respect to selective cyclooxygenase-2 inhibitors": "...thrombosis would be expected to occur in patients who are already at increased risk because of other underlying conditions" and "In the VIGOR trial...The rates of nonfatal myocardial infarction, nonfatal stroke, and death from any vascular event were higher in the rofecoxib group than in the naproxen group (0.8 percent vs. 0.4 percent, $P<0.05$). This difference was largely due to a difference in the incidence of myocardial infarction (0.4 percent in the rofecoxib group vs. 0.1 percent in the naproxen group, $P<0.01$). In contrast, in the CLASS trial, in which 21 percent of the patients took aspirin, there was no significant difference the treatment groups in the incidence of major cardiovascular events." NEJM Volume 345:433-442 August 9, 2001 Number 6.

32.    Defendants, Robert Wall, Gary Harlin, Hal Henderson, Steve Santos, Patricia Aiken, Angela Finch, Sonya Coley, Jason Delk and Matthew King, being the professional staff of Merck for the sales of Merck's products in the state of Alabama were aware of all of these facts, points and details. Knowing these facts, the defendants had a duty to inform, immediately, the doctors to whom they had given samples or otherwise sold Vioxx or promoted Vioxx to such doctors and other persons, of the important facts described above. This duty was fully applicable to the said defendants, Robert Wall, Gary Harlin, Hal Henderson, Steve Santos, Patricia Aiken, Angela Finch, Sonya Coley, Jason Delk and Matthew King, and their employer, Merck, prior to the time that the plaintiff's use of Vioxx. The said defendants, Robert Wall, Gary Harlin, Hal Henderson, Steve

Santos, Patricia Aiken, Angela Finch, Sonya Coley, Jason Delk and Matthew King, and defendant

Merck, had a full duty, obligation, and responsibility, to advise and warn, and to disclose that the

facts that they had previously provided were no longer true or correct.

33. The said defendants, Robert Wall, Gary Harlin, Hal Henderson, Steve Santos, Patricia

Aiken, Angela Finch, Sonya Coley, Jason Delk and Matthew King, and their employer, Merck, were

both negligent and wanton in their failure to perform their duties and obligations under applicable

law to advise all customers of Merck taking Vioxx directly or through their physicians of the dangers

now known and disclosed, but said defendants and each and every one of them failed in his said duty

imposed by law. The said defendants, Robert Wall, Gary Harlin, Hal Henderson, Steve Santos,

Patricia Aiken, Angela Finch, Sonya Coley, Jason Delk and Matthew King, and their employer,

Merck, failed to exercise ordinary and reasonable care in the performance of their job functions and

duties.

34. The said defendants, Robert Wall, Gary Harlin, Hal Henderson, Steve Santos, Patricia

Aiken, Angela Finch, Sonya Coley, Jason Delk and Matthew King, and their employer, Merck, knew

the foregoing true facts concerning Vioxx, prior to their representations concerning the safety and

efficacy of Vioxx, but nevertheless, continued to represent that the product was safe and effective.

The true facts, as indicated above, was that the said drug, Vioxx, was unreasonably safe and

unreasonably dangerous, but the said individual defendants and their employer, Merck, willfully

misrepresented the facts to physicians and others in the state of Alabama with the design and intent

to market the dangerous and defective drug notwithstanding the knowledge of the dangers and

defects. This conduct constitutes actionable fraud and deceit, and these misrepresentations were

relied upon to the detriment of the plaintiff in particular, and the customers of Merck, receiving

Vioxx in general. The actions of defendants and others combined and concurred to constitute a

conspiracy for which they are civilly liable.

35.    While today Merck warns of "heart attacks and similar serious events have been reported in patients taking Vioxx" at the time this information was hidden and concealed, and representations were made by the defendants that indicated that the product was, instead, safe and effective.

36.    As a result of the reliance by Plaintiff, the medical community, and the public generally on the representations and statements of the defendants, including the individual defendants herein and Merck, the Plaintiff took and consumed Vioxx. As a proximate result and consequence of his ingestion of Vioxx and as a direct and proximate consequence and result of the acts and omissions of the defendants including the individual defendants as described herein, plaintiff was injured.

37.    Merck was well aware of the Pharmacia-sponsored Celebrex Long-Acting Safety Study (CLASS), also involving about 8,000 arthritis sufferers, compared that drug to the older NSAIDs ibuprofen and diclofenac to determine whether it was less harmful to the stomach. In a JAMA article in 2000, the researchers published data accumulated over six months and concluded that Celebrex caused fewer ulcers than the older drugs. (Fred E. Silverstein et al., Gastrointestinal Toxicity with Celecoxib vs. Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis: The CLASS Study: A Randomized Controlled Trial, 284 JAMA 1247 (2000). However, researchers at that point had 12 months of data that, when analyzed as a whole, showed no significant difference.

38.    The FDA said the CLASS study "did not show a safety advantage in upper gastrointestinal events for Celebrex compared to either ibuprofen or diclofenac." Because some of the study participants were also taking aspirin, which does affect the stomach, some analysts say the

results may have been skewed. The company maintained that among those not taking aspirin, the rate of ulcers was lower in Celebrex takers. Again, Celebrex is relevant to this case because of the knowledge and notice provided to Merck and its defendant-employees.

39.     In a June 2002 editorial, the British Medical Journal said the Celebrex study misled consumers with "overoptimistic" data. It said the study was "seriously biased" because the complete results "clearly contradict[ed] the published conclusions" and showed a similar number of stomach complications in all patients, whether they took Celebrex or the older pain relievers.

40.     It has been reported that a substantial number of deaths worldwide have been associated with Vioxx.

41.     Plaintiff seeks, in addition to damages for personal injury, a refund of and restitution for monies paid as a result of his purchase of Vioxx, as well as all other ascertainable economic loss that occurred as a result of Defendants' wrongful and improper conduct in connection with the manufacture, marketing, distribution, testing, promotion, labeling and/or selling of Vioxx. Plaintiff therefore seeks to have the Defendants return the monies unlawfully and inappropriately acquired by them as a result of their sale of Vioxx.

42.     Plaintiff seeks to have defendants fully disclose and account for, and effect the accumulation and analysis of relevant medical information on Vioxx, including, but not limited to, the results of all appropriate diagnostic tests performed  as part of a medical research and for medical information concerning all persons as gathered, maintained and analyzed, and for medical research concerning the incidence, prevalence, natural course and history, diagnosis and treatment of Vioxx-induced personal injuries, and all this should be disclosed to plaintiff in this litigation.

## PLAINTIFF'S CLAIMS FOR RELIEF

## COUNT I

## PRODUCTS LIABILITY UNDER AEMLD AND STRICT LIABILITY PURSUANT TO §402A OF THE RESTATEMENT (SECOND) OF TORTS

43.    Plaintiff incorporates by reference and realleges, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

44.    Defendants are manufacturers and/or suppliers of Vioxx and each had an opportunity to inspect the product which was superior to the knowledge or opportunity of the consumer, Plaintiff herein. The Defendants were engaged in the business of manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing Vioxx in interstate commerce, which they sold and distributed throughout the world, including the State of Alabama, to Plaintiff.

45.    The Vioxx product supplied, distributed and manufactured by Merck, and A, B, C, D and E and placed in the stream of commerce by defendants, and others were defective and unreasonably dangerous in design, manufacture and/or formulation in that, when it left the hands of the Defendants as manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation and they were unreasonably dangerous and defective. Plaintiff shows that he suffered injury and damages as a result of the sale by Defendants who sold the product in defective condition unreasonably dangerous to the ultimate consumer, and all the sellers were engaged in the business of selling such product and product was expected to and did reach the user or consumer without substantial change in the condition in which it is sold. The Plaintiff was using Vioxx in a manner for which it was intended or in a reasonably foreseeable manner.

46.    Vioxx was expected to and did reach the Plaintiff without substantial change in its condition as manufactured, created, designed, tested, labeled, sterilized, packaged, supplied, marketed, sold, advertised, undertook to warn, and otherwise distributed.

47.    The Vioxx manufactured by Merck, and/or A, B, C, D and E and supplied by them was defective in manufacture, design or formulation, in that, when it left the hands of the manufacturer and/or suppliers, it was unreasonably dangerous, in that it not meet the reasonable expectations of the ordinary consumer as to safety, and was more dangerous than an ordinary consumer would expect and more dangerous than other pain relievers. The plaintiff shows that the product was unreasonably dangerous when it left the defendants' control, that it was substantially unaltered when the plaintiff used it, and that it proximately caused the plaintiff's injuries. The Plaintiff was not aware of, and in the exercise of reasonable caution could not have discovered, the dangerous nature of Vioxx.

48.    The Vioxx manufactured and/or supplied by Defendants was also defective due to inadequate warning or instruction because the manufacturers and suppliers knew or should have known that the products created an unreasonable risk of harm to consumers and the Defendants failed to adequately warn of said risks. The Defendants' Vioxx caused increased risks of excess deaths and cardiovascular events, as well as kidney damage, aseptic meningitis, and slow healing of bone fractures upon consumption, and therefore constitute a product unreasonably dangerous for normal use due to their defective design, defective manufacture, and the Defendants misrepresentations and inadequate facts disclosed to the Plaintiff and his doctors. The Vioxx manufactured and/or supplied by Defendants was defective due to inadequate care in marketing and post-marketing warnings or instruction because, after the Defendants knew or should have known of the risk of injury from Vioxx and/or combination use of these drugs, they failed to provide

adequate warnings to users or consumers of the product and continued to promote the product.

49.    As a direct and proximate result of Defendants' manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing Vioxx in interstate commerce, Plaintiff has suffered the injuries described elsewhere in this Complaint and was at an increased risk of and did in fact suffer by developing and suffering a cardiovascular event and has suffered damages and plaintiff is entitled to compensatory and punitive damages in an amount just and proper under law for personal injuries and other recoverable damages.

50.    The Defendants, therefore, are liable to the Plaintiff. The conduct of Merck and A, B, C, D and E was gross, willful, wanton, oppressive, intentional, burdensome, and otherwise such as to justify the imposition of punitive damages under Alabama law. Additionally, Defendants' conduct was so outrageous as to constitute ill will, bad motive and reckless indifference to the interests of the consumers. The Plaintiff, therefore, is entitled to punitive damages. All of the Defendants are liable to Plaintiff jointly and severally for all general, special and other relief to which the Plaintiff is entitled by law. As a consequence of the producing cause and as a legal result of the dangerous and defective condition of Vioxx as sold, developed, designed, marketed, manufactured and/or supplied by Defendants, and as a direct and legal result of the tort, AEMLD violation, negligence and wantonness, carelessness, other wrongdoing and action(s) of Defendants described herein:

a.    Plaintiff was injured in his health, strength and activity and suffered injuries to body and mind;

b.    Plaintiff has sustained economic loss, loss of earnings and diminution or loss of earning capacity, the exact amount of which is presently unknown;

c.     Plaintiff required reasonable and necessary health care, attention and services and did incur medical, health, incidental and related expenses. As a direct and proximate result of Defendants' manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing Vioxx in interstate commerce, Plaintiff has suffered the injuries described elsewhere in this Complaint and Plaintiff has suffered damages and is entitled to recover compensatory and punitive damages in an amount just and proper under law for personal injury and other recoverable damages.

## COUNT II

### NEGLIGENCE AND WANTONNESS

51.     Plaintiff incorporates by reference and realleges, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

52.     It was the duty of the Defendants Merck, Wall, Harlan, Henderson, Santos, Aiken and King, and fictitious defendants, to use reasonable care in the manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing Vioxx.

53.     Contrary to their duty, the said Defendants were guilty of one or more of the following careless, negligent and wanton acts and/or omissions:

a.     Said Defendants failed adequately and properly to test, study and inspect Vioxx so as to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured and sold;

b.     Failed to utilize and/or implement a reasonably safe design in the manufacture of Vioxx;

c.     Failed to manufacture Vioxx in a reasonably safe condition for which

it was intended;

     d.     Failed to adequately and properly warn Plaintiff purchasing Vioxx of the risks of complications when used in a manner for which it was intended;

     e.     Failed to adequately and properly warn Plaintiff purchasing Vioxx of the risks of diseases when used in a manner for which it was intended;

     f.     Failed to adequately and properly label Vioxx so as to warn the Plaintiff of the risks of complications;

     g.     Failed to adequately and properly label Vioxx so as to fairly and sufficiently warn the Plaintiff of the risks of excess deaths and cardiovascular events as well as kidney damage, aseptic meningitis, and slow healing of bone fractures;

     h.     Manufactured Vioxx which constituted a hazard to health;

     i.     Manufactured Vioxx which caused adverse side effects;

     j.     Sold and pushed Vioxx and handed out samples thereof while misrepresenting through word, deed, actions, distributing printed and other materials, all of the most important information concerning the dangers of Vioxx including especially the danger posed of sudden cardiovascular death; and

     k.     Were otherwise careless, negligent and wanton.

     54.     As a direct and proximate result of Defendants' manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing Vioxx in interstate commerce, Plaintiff has suffered the injuries described elsewhere in this Complaint and Plaintiff has suffered damages and is entitled to recover compensatory and punitive damages in an amount just and proper under law for personal injury and other recoverable damages.

## COUNT III

### NEGLIGENCE PER SE

55.    Plaintiff incorporates by reference and realleges, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

56.    Defendants Merck, Wall, Harlan, Henderson, Santos, Aiken and King, and the fictitious defendants, had an obligation not to violate the law in the manufacture, design, formulation, compounding, testing, production, processing, assembly, inspection, research, distribution, marketing, labeling, packaging, preparation for use, sale and warning of the risks and dangers of Vioxx.

57.    Defendant, Merck, Wall, Harlan, Henderson, Santos, Aiken, Angela Finch, Sonya Coley, Jason Delk King, and the fictitious defendants, violated Alabama Code §20-1-26, §20-1-27, and §8-19-5, et seq., related amendments and codes and regulations provided there under, and other applicable laws, statutes and regulations. No action is brought herein for violation of federal statutes, but claim is made for violation of the foregoing and any other state's applicable laws.

58.    Plaintiff, as purchaser and consumer of Vioxx, is within the class of persons the state statutes and regulations described above are designed to protect and Plaintiff's injuries are the type of harm these statutes are designed to prevent.

59.    The defendants, Merck, Wall, Harlan, Henderson, Santos, Aiken, Angela Finch, Sonya Coley, Jason Delk King, and the fictitious defendants made false and fraudulent misrepresentations to physicians, Plaintiff, and the general public that Vioxx is or was safe, effective, fit for its use as designated, and that it's components are not hazardous to the health of users all in violation of Alabama Code § 20-1-26 and 20-1-27 and other applicable law. Defendants' acts constitute a breach of duty subjecting Defendants to civil liability for all damages arising there from,

under theories of negligence per se. Alabama Code §20-1-27 states that "No person shall engage in any of the following activities within this state:(1) Manufacture for sale herein, have in his or his possession with intent to sell, offer or expose for sale, sell, or deliver any article of food or drugs which is adulterated or misbranded within the meaning of this division."

60.    Said Defendants failed to meet the standard of care set by the following statutes and regulations, which were intended for benefit of individuals such as Plaintiff, making Defendants negligent per se:

a.    The defendants made false and fraudulent misrepresentations to physicians, Plaintiff, and the general public that Vioxx is or was safe, effective, fit for its use as designated, and that it's components are not hazardous to the health of users all in violation of Alabama Code § 20-1-26 and 20-1-27 and other applicable law;

b.    The labeling did bear or contain statements, designs or devices regarding the curative or therapeutic effect of Vioxx which were false or fraudulent and which concealed, in that they failed to provide adequate warnings of, severe and disabling medical side effects and conditions including, without limitations, cardiovascular events, hypertension and edema, as well as kidney damage, aseptic meningitis, and slow healing of bone fractures, excess deaths and adverse events and other adverse medical conditions as soon as there was reasonable evidence of their association with the drug;

c.    There was misleading and inadequate information for patients for the safe and effective use of Defendants' drug in that a drug shall be deemed misbranded "If its package or label shall bear or contain any statement, design or device regarding the curative or therapeutic effect of such article or of any of the ingredients or substances contained therein which is false or fraudulent"; and

d.    There was misleading and inadequate information regarding special care to be exercised by the doctor for safe and effective use of Defendants' drug and the drug was therefore, misbranded.

61.    As a proximate result of the defendants' violations of the statutes described above, Plaintiff suffered injuries and personal injury and damages as alleged herein.

## COUNT IV

## UNJUST ENRICHMENT

62.    Plaintiff incorporates by reference and realleges, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

63.    As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefitted from the purchase Vioxx by the Plaintiff, to wit:  (a) Defendants have voluntarily accepted and retained these profits and benefits, derived from the Plaintiff, with full knowledge and awareness that, as a result of Defendants' fraud and other conscious and intentional wrongdoing, Plaintiff was not receiving a product of the quality, nature, or fitness that had been represented by Defendants or that Plaintiff, as a reasonable consumer, expected.  (b) By virtue of the conscious wrongdoing alleged in this Complaint, Defendants have been unjustly enriched at the expense of the Plaintiff, who is entitled to in equity, and hereby seeks, the restitution of Defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the jury; and such other relief as the jury deems just and proper to remedy the Defendants' unjust enrichment.

## COUNT V

### BREACH OF EXPRESS WARRANTY

64.    Plaintiff incorporates by reference and realleges, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

65.    Defendants expressly warranted to Plaintiff, by and through statements made by Defendants or their authorized agents or sales representative, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Vioxx was safe, effective, fit and proper for its intended use.

66.    In using Vioxx, Plaintiff relied on the skill, judgment, representations and foregoing express warranties of the Defendants. Said warranties and representations were false in that the aforementioned product was not safe and was unfit for the uses for which it was intended.

67.    As a direct and proximate result of Defendants breaches of warranties, Plaintiff has suffered the injuries described elsewhere in this Complaint and Plaintiff was at an increased risk of and did in fact suffer by developing cardiovascular events and has suffered damages for which Plaintiff is entitled to recover from Defendants in an amount just and proper under law for personal injury and other recoverable damages.

## COUNT VI

### BREACH OF IMPLIED WARRANTY

68.    Plaintiff incorporates by reference and realleges, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

69.    Prior to the time that Vioxx was used by Plaintiff, Defendants impliedly warranted to Plaintiff that Vioxx was of merchantable quality and safe and fit for the use for which it was intended.

70.    Plaintiff was unskilled in the subject of pharmacology or the research, design and manufacture of Vioxx and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using Vioxx.

71.    Vioxx was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would cause severe injuries and death to the user.

72.    As a direct and proximate result of Defendants' breaches of warranties, Plaintiff has suffered the injuries described elsewhere in this Complaint and Plaintiff was at an increased risk of and did in fact suffer by developing cardiovascular events and has suffered damages for which Plaintiff is entitled to recover from Defendants in an amount just and proper under law for personal injury and other recoverable damages.

## COUNT VII

## CORPORATE RESPONSIBILITY:

## JOINT VENTURES, PARENT/SUBSIDIARIES,

## AND/OR SUCCESSOR CORPORATION

73.    Plaintiff incorporates by reference and realleges, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

74.    As a result of their control or participation in various joint ventures, parent/subsidiary relationships and/or successor corporations, Defendants are liable to the Plaintiff.

75.    As a result of their negligent and wanton supervision and actual supervision of various joint ventures, parent/subsidiary relationships and/or successor corporations, Defendants are liable to Plaintiff.

76.    As a result of the existence or invalidity of various indemnification agreements,

Defendants are liable to Plaintiff.

77.    Defendants are liable to Plaintiff, as alter egos of their joint ventures, parent/subsidiary relationships and/or successor corporations.

## COUNT VIII

### CIVIL CONSPIRACY

78.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here and further alleges as follows:

79.    Defendants, Merck, Wall, Harlan, Henderson, Santos, Aiken, Angela Finch, Sonya Coley, Jason Delk King, and fictitious defendants combined and conspired to do those acts complained of in Count I through Count IX, as a result of which the Plaintiff has suffered harm, damages and injuries as previously described.

## COUNT IX

### FRAUD AND DECEIT

80.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here and further alleges as follows:

81.    Merck and the sales representative Defendants made material misrepresentations of fact to the medical community, the Plaintiff, the public generally, the governmental entities charged with the protection of the public from unsafe drugs, and to opinion leaders in the medical profession, intentionally in some cases and often with the specific intention of deceiving all these for monetary gain to the Defendants, and in some cases negligently and wantonly, and even in rare cases, innocently, in all instances, with the intent and purpose to advance the sales of the dangerous drug Vioxx. The Defendants further suppressed material facts as to which they were under a duty to communicate to all of the above persons and entities. The misrepresentation and suppression was,

in each case, of material and important facts essential for the health and safety of the public and of Plaintiff in particular. As a result of the misrepresentations, deceit, and suppression by the Defendants as set forth previously in this Complaint and as set forth below, these parties, and Plaintiff were deceived and defrauded, and as a direct and proximate result of the said deceit, fraud, misrepresentation, and fraudulent suppression the Plaintiff suffered the harm and injury as set forth in this Complaint.

82.    By the time Merck voluntarily withdrew the anti-inflammatory drug Vioxx from the market in September 2004, more than 100 million prescriptions had been dispensed in the United States. Yet the vast majority of these prescriptions were written by physicians after Merck and the Sales Representative Defendants knew that evidence of Vioxx's risks had already surfaced. Even as evidence mounted in Defendants' hands that use of Vioxx was associated with heart attacks and strokes, physicians continued to prescribe Vioxx to millions of patients. The reason is the fraudulent scheme perpetrated by the defendants. A major part of the explanation may be found by examining the strategies that Merck and its sales representatives used to market Vioxx to physicians. Based on Merck documents, Merck sent over 3,000 highly trained representatives, including the individual defendants herein, into doctors' offices and hospitals armed with misleading information about Vioxx's health risks. The documents indicate that Merck instructed these representatives to show physicians a pamphlet indicating that Vioxx might be 8 to 11 times safer than other anti-inflammatory drugs, prohibited the representatives from discussing contrary studies (including those financed by Merck) that showed increased risks from Vioxx, and launched special marketing programs — named "Project XXceleration" and "Project Offense" and "Dodgeball"— to overcome the cardiovascular "obstacle" to increased sales.

83.    On information and belief, Plaintiff avers that while some sales representatives

eventually refused to continue with this course of conduct, other representatives, including the individual defendants herein, continued on with the misrepresentations and fraudulent concealment, notwithstanding knowledge of the falsity and of the dangers to patients. The Sales Representative Defendants were provided two types of materials relevant to drug safety and effectiveness: "approved" and "background" materials. The "approved" items were to be aggressively used in pushing Vioxx because they were things like medical journal articles favorable to Merck. On the other hand the "background" materials also contained things unfavorable to Vioxx, and the Sales Representative Defendants suppressed this information from the prescribing doctors as Merck requested.

84.     The documents reveal that Merck exhaustively trained its representatives on how to persuade doctors to prescribe Vioxx and other Merck products. No interaction with physicians appears to have been too insignificant for instruction. Merck representatives were taught how long to shake physicians' hands (three seconds), how to eat their bread when dining with physicians ("one small bite size piece at a time"), and how to use "verbal and non-verbal" cues when addressing a physician to "subconsciously raise... his/her level of trust." Merck instructed its representatives on the various personality types of doctors (including "technical," "supportive and expressive") and recommended targeted sales techniques for each type. And Merck rewarded its sales force with thousands of dollars in cash bonuses for meeting sales goals.

85.     The company assigned individual doctors a "Merck potential" and graded them on how often they prescribed Merck products. The Sales Representative Defendants were also involved in the Merck scheme to communicate misinformation about Vioxx to what Defendants called "thought leaders" in the medical community. By this device, Defendants could sell more Vioxx even to those doctors to whom they did not or could not speak directly or in detail. The "thought leaders"

were to influence the medical community to push more Vioxx, despite the dangers, since they could "influence colleagues through peer-to-peer relationships." To help them do this, the Sales Representative Defendants used Merck-paid honoraria (money) to these "thought leaders" to influence the medical community to favor Vioxx and to prescribe it notwithstanding the dangers.

86.    The documents describe in detail how Merck used this highly trained sales force to respond to reports of Vioxx's safety risks. The first public indication that Vioxx posed a heightened risk of heart attack and stroke came in March 2000, when Merck's VIGOR study showed a five-fold increase in the risks of heart attacks in patients on Vioxx compared to patients on naproxen. This study was followed by cautionary discussions of the cardiovascular risks of Vioxx at a meeting of an advisory committee to the Food and Drug Administration in February 2001, in a New York Times article in May 2001, and in a paper in the Journal of the American Medical Association in August 2001.

87.    After each of these developments, Merck sent bulletins or special messages to its sales force, directing them to use highly questionable information to assuage any physician concerns.

88.    For example, the Merck documents show:

a.    After Merck's VIGOR study reported increased heart attack risks, Merck directed its sales force to show physicians a "Cardiovascular Card" that made it appear that Vioxx could be 8 to 11 times safer than other anti-inflammatory drugs. This card omitted any reference to the VIGOR findings and was based on data FDA considered to be inappropriate for a safety analysis.

b.    After the FDA advisory committee voted that physicians should be informed about the risks found in the VIGOR study, Merck sent a bulletin to its sales force that advised: "DO NOT INITIATE DISCUSSIONS ON THE FDA

ARTHRITIS COMMITTEE ... OR THE RESULTS OF THE ... VIGOR STUDY."
If physicians asked about the VIGOR study, Merck representatives were directed to
respond, "I cannot discuss the study with you."

      c.     After the New York Times reported on the cardiovascular dangers of
Vioxx, Merck instructed its field staff to tell physicians that patients on other anti-
inflammatory medications were eight times more likely to die from cardiovascular
causes than patients on Vioxx. The Merck bulletin told its sales force to show
physicians the Cardiovascular Card and state: "Doctor, as you can see,
Cardiovascular Mortality as reported in over 6,000 patients was Vioxx .1 vs.
NSAIDS .8 vs. Placebo 0."

    89.    After extensive negotiations, FDA and Merck agreed on a label change for Vioxx in
April 2002 that mentioned the cardiovascular findings from the VIGOR study. The final label
included the statement that the significance of these findings were "unknown." According to the
documents, Merck instructed its representatives to emphasize this statement on new label to counter
physician safety concerns. Merck documents show that in fact the cardiovascular risks were actually
well-known, but suppressed, by Defendants.

    90.    Merck and other drug companies maintain publicly that their representatives play a
vital role in the health care system by educating physicians about new drugs and ongoing research.
But the Merck documents reveal another side to company marketing efforts. The documents show
that Merck trained its representatives to capitalize subtly on every interaction with physicians to
promote Merck products. When concerns about Vioxx's safety arose, Merck used this highly trained
force to present a misleading picture to physicians about the drug's cardiovascular risks. Merck's
and the Sales Representatives' promotional efforts explain in large part why Vioxx sales remained

strong even as the evidence of the drug's dangers mounted. Prescribing doctors were massively misled.

91.    The Sales Representative Defendants represented to the Plaintiff's prescribing physicians false and misleading information concerning the drug Vioxx. The Defendants, pursuant to the Defendants' "Dodgeball" program and other plans to misrepresent the safety of Vioxx, communicated that the drug was safe for the cardiovascular system, and did not increase the risk stroke or heart attack. The Plaintiff's physician did prescribe the subject drug to the Plaintiff, as a result of, and in reliance upon, the misrepresentations by the Defendants' including the Sales Representative Defendants who made direct communications to the physician. The physicians made determinations concerning the use of this medication based on false and fraudulent information provided by the defendants including the Sales Representative Defendants, and did not act in their proper role as a learned professional in that physicians were given wrongful, false, incomplete, misleading and wrong information by the defendants, including the Sales Representative Defendant.

92.    The negligence and wantonness of the defendants, including the Sales Representative Defendants, was the proximate cause of the injuries and death suffered by Plaintiff. Because the Plaintiff's physicians were prevented from exercising and operating in their full role as learned professionals, because of missed information given to them by defendants, they were deprived of the full and adequate information needed to act in a learned manner in deciding and determining how to prescribe pain relieving medication to the Plaintiff, with the proximate result and consequence that the physicians did in fact prescribe the dangerous and deadly drug, Vioxx, to Plaintiff, causing his injuries.

93.    The Plaintiff suffered personal injury as a direct and proximate result and consequence of the wrongful acts and omissions of each of the defendants. The plaintiff would not

have been described the subject drug, Vioxx, by his physician, if the physician had not been given wrongful and incorrect information by the defendants including the Sales Representative Defendants.

94.     If Defendant had not engaged in this conduct, consumers, such as the Plaintiff, would have switched from Vioxx to safer products or refrained wholly from its efficacy.

95.     From approximately 1999 through the date of Plaintiff injuries Defendants engaged in a scheme of marketing, distributing and/or selling Vioxx under the guise that it was safe and efficacious for persons such as the Plaintiff.

96.     Plaintiff alleges that the marketing strategies, including without limitation the detail and sampling programs and direct-to-consumer advertising, used by Merck, targeted consumers like the Plaintiff to induce his to purchase and use Vioxx. Defendants distributed, manufactured and marketed Vioxx, in a manner designed to convince and his physicians to rely on the marketing, advertisements and product information propounded by Defendant.

97.     On September 30, 2004, Merck voluntarily removed Vioxx from all markets in the United States.

98.     The sales representative Defendants negligently, recklessly, intentionally and fraudulently made material representations that Vioxx was safe and effective. The sales representative Defendants represented Vioxx as safe so that the general consuming public, including Plaintiff and his physicians, would rely upon said representations when purchasing the product. The sales representative Defendants also suppressed the cardiovascular risks from prescribing physicians, and consumers such as the Plaintiff, even though they had knowledge of the risks.

99.     Merck trained its sales representatives, through programs such as the "Vioxx Obstacle Dodge Ball Program," the "Obstacle Response Guide for Vioxx," and "Top Ten Obstacle Handlers" to misstate, conceal, and misrepresent the truly dangerous nature of Vioxx to prescribing physicians.

The sales representative Defendants applied, utilized and put into practice each of these programs with the doctors in question.

100.    These programs were specifically designed and promulgated by Merck to mislead prescribing physicians about the safety of Vioxx.

101.    These programs were specifically designed and promulgated by Merck to mislead prescribing physicians about the life threatening side effects, including myocardial infarction and stroke, of Vioxx.

102.    Merck trained its sales representative force, including the sales representative Defendants, to utilize its "Dodge Ball" and "Obstacle Avoidance" programs during the sales representatives' interactions with or "calls" upon prescribing physicians, and Defendants put them into full effect with the subject doctors.

103.    These programs were utilized by sales representatives, including the sales representative Defendants to "dodge" relevant safety questions by physicians to who promoted and or sold Vioxx. Indeed, these programs provide specific responses and representations that are to be made by Merck sales representatives to physicians during the sales calls or in response to physician questions. These Merck mandated responses misrepresented the safety of Vioxx.

104.    The Vioxx Obstacle Dodge Ball Program identifies and categorizes physician safety questions as "obstacles" to Merck's sales force. The "Dodge Ball" program specifically instructs sales representatives, including the sales representative Defendants, to "dodge" these physicians' safety related questions/obstacles. Indeed, the last few pages of the "Dodge Ball" instruction manual simply state "DODGE," "DODGE," and "DODGE." The safety questions to be "dodged" by sales representatives, including the sales representative Defendants, include, inter alia, questions such as, "I am concerned about the cardiovascular effects of Vioxx," and "The competition has been in my

office telling me that the incidence of heart attacks is greater with Vioxx than with Celebrex."

105.    Additional sales representative guidelines provide specific answers to physician questions/obstacles (such as those noted above) that were to be recited by sales representatives, including the sales representative Defendants. The top three "obstacles" listed on the sales guidelines are physician safety questions involving Vioxx related "Cardiovascular Events." Sales representative, including the sales representative Defendants, are thereafter provided with specific misrepresentations to make to the concerned physicians about the safety of Vioxx. For example, bulletins from Merck to its sales representatives state, "in response to recent published reports about Vioxx on May 1, 2000, we provided you with an approved verbal response to use to address customers' questions around the incidence rate of MI's [myocardial infarctions] on patients taking Vioxx..." (Bulletin for Vioxx: New PIRs Relative to Vioxx GI Outcomes Research Study). Sales representatives, including the sales representative Defendants, were therefore required to misrepresent that Vioxx does not increase the rate of myocardial infarctions when compared with Naiad's. This misrepresentation is false and inaccurate, yet was intentionally, knowingly, recklessly, wantonly and/or negligently made to treating physicians, including each Plaintiff's prescribing physician, by the individually named sales representatives. In an instructional video used to train sales representatives, an actress playing "an obstacle" to Vioxx sales says, "I'm afraid Vioxx causes M.I.'s" - a reference to myocardial infarctions, or heart attacks. In response, an actress playing a Merck sales representative says, "That's not true." This was wrong, Vioxx causes M.I.'s. The mechanism of Vioxx-induced heart attack and stroke is the same – vasoconstriction and blood-clot creation.

106.    Merck's sales representatives, specifically the sales representative Defendants, utilized the misrepresentations contained in the obstacle avoidance programs to mislead each

Plaintiff's treating physician concerning the safety of Vioxx and the occurrence of life threatening side effects, such as strokes and myocardial infarctions, from the usage of Vioxx.

107.   Merck and the individually named sales representatives further misrepresented the safety of Vioxx to prescribing physicians by providing written literature to the doctors that contained false statements about Vioxx's safety. Such literature would be forwarded to the physician who posed questions/obstacles to the sales representatives after the sales representatives had concluded their meeting with the physician, entitled "In Response To Your Questions" (follow-up literature that misrepresents Vioxx's cardiovascular safety) and "In Response To Your Questions: Cardiovascular System", which also misrepresents the risks associated with Vioxx.

108.   Sales representatives, including the sales representative Defendants, were also ordered to send follow-up letters to physicians with whom they met who had posed questions/obstacles. These letters would downplay the cardiovascular risks associated with Vioxx, even though the defendants were well aware that the risks existed.

109.   The underlying inducement for both Merck and its sales representatives, including the sales representative Defendants, to make repeated misrepresentations to physicians about the safety of Vioxx was money. The more doctors prescribed Vioxx, the more money Merck made. The more doctors the sales representatives, including the sales representative Defendants, cajoled into prescribing Vioxx, the more money and non-monetary bonuses the sales representatives received. Thus, sales representatives, such as the sales representative Defendants, had a financial interest in disseminating the false and misleading information, while concealing the known risks (i.e., obstacle responses) outlined above to as many prescribing physicians as possible, including Plaintiff's prescribing physician.

110.   Plaintiff and his prescribing physician reasonably relied, to their detriment, upon the

false oral and written misrepresentations of Merck, and the sales representative Defendants, concerning the safety of Vioxx and the absence of adverse cardiovascular events in users. Such reasonable reliance induced each Plaintiff's treating physician to prescribe his Vioxx and further induced the Plaintiff to utilize the dangerous drug Vioxx. As a direct and proximate result of Plaintiff's usage of Vioxx, they were injured as described herein. Such event has caused Plaintiff's great pain and suffering, mental anguish, expense.

111.    On June 23, 2005 conduct of Merck and its sales representatives was summarized in the New England Journal of Medicine as follows:

"The pharmaceutical industry spends more than $5.5 billion to promote drugs to doctors each year — more than what all U.S. medical schools spend to educate medical students. Major drug companies employ about 90,000 sales representatives — one for every 4.7 doctors in the United States, according to the American Medical Association. Although substantial marketing expenditures are common in many industries, the potential effect of drug marketing on health raises special concerns. For years, the industry has justified these expenditures on the grounds that they fund essential education for doctors. According to the Web site of the Pharmaceutical Manufacturers and Research Association, "many physicians learn about new drugs - indeed, about ongoing research in their areas of specialization - largely through information provided by the companies that market new products." But if the primary goal is sales, not education, and the information provided to physicians is slanted or misleading, the health consequences for patients can be serious.

112.    "Because of the recent events surrounding rofecoxib, the May 5 hearing of the Government Reform Committee focused on Merck, the manufacturer of Vioxx... Merck cooperated voluntarily with our request for information, providing more than 20,000 pages of internal company documents. Merck also voluntarily sent a senior executive to testify at the hearing and answer the committee's questions. Yet as we learned, even a company like Merck can direct its sales force to

provide clinicians with a distorted picture of the relevant scientific evidence.

113    "On February 7, 2001, the Arthritis Drugs Advisory Committee of the Food and Drug Administration (FDA) met to discuss the VIGOR study. At this meeting, Merck argued that the significant increase in the rate of myocardial infarction (which further analysis had determined to be a fivefold increase) was explained by a protective effect of naproxen, not by any inherent risk posed by its drug. After the FDA's medical reviewer and others expressed concern about this explanation, the advisory committee voted unanimously that physicians should be made aware of VIGOR's cardiovascular results.

114.    "The next day, Merck sent a bulletin to its rofecoxib sales force of more than 3000 representatives. The bulletin ordered, "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE . . . OR THE RESULTS OF THE . . . VIGOR STUDY." It advised that if a physician inquired about VIGOR, the sales representative should indicate that the study showed a gastrointestinal benefit and then say, "I cannot discuss the study with you."

115.    "Merck further instructed its representatives to show those doctors who asked whether rofecoxib caused myocardial infarction a pamphlet called "The Cardiovascular Card." This pamphlet, prepared by Merck's marketing department, indicated that rofecoxib was associated with 1/8 the mortality from cardiovascular causes of that found with other anti-inflammatory drugs. Stroke is caused by Vioxx with the same mechanism as myocardial infarction.

116.    "The Cardiovascular Card provided a misleading picture of the evidence on rofecoxib. The card did not include any data from the VIGOR study. Instead, it presented a pooled analysis of preapproval studies, in most of which low doses of rofecoxib were used for a short time. None of these studies were designed to assess cardiovascular safety, and none included adjudication of cardiovascular events. In fact, FDA experts had publicly expressed "serious concerns" to the

agency's advisory committee about using the preapproval studies as evidence of the drug's cardiovascular safety.

117. "Persistent physicians who sought additional information about the cardiovascular effects of rofecoxib were directed to send inquiries to the company's headquarters. Merck's response to these physicians highlighted the misleading information from the Cardiovascular Card.

118. "Beyond these specific communications to physicians, our committee also heard evidence of a broad disparity between the evidence-based perspective provided by scientific journals and expert committees, on the one hand, and the sales pitch used by the company's field staff, on the other. Merck instructed its sales representatives, for example, to provide only certain approved study results to doctors. Approved scientific studies were defined as those that provide "solid evidence as to why [doctors] should prescribe Merck products for their appropriate patients." By contrast, those studies that raised safety questions about drugs were considered background studies. Distributing the results of a background study was "a clear violation of Company Policy."

119. "Merck also trained its representatives to identify speakers for educational events who were "opinion leaders" who could provide "favorable" views of the company's products to other doctors. Underlining the promotional nature of these events, Merck instructed its sales representatives to track whether the physicians who attended them subsequently prescribed more Merck drugs.

120. "In addition to providing selective evidence and biased presentations, Merck counseled its representatives to use an array of subliminal selling techniques to affect prescribing - potentially undermining the ability of physicians to choose drugs strictly on the basis of the risks, benefits, and costs for a particular patient. For example, in a training course on selling skills, Merck

taught representatives to mimic the words and body language of doctors during sales calls. The curriculum explained that 'mirroring is the matching of patterns, verbal and non-verbal, with the intention of helping you enter the customer's world. It is positioning yourself to match the person talking. It subconsciously raises his/her level of trust by building a bridge of similarity.'"

121.    The sales representative Defendants personally performed the acts and omissions described herein and participated in the torts alleged herein. The sales representative Defendants had knowledge of the cardiovascular risks associated with Vioxx, and misrepresented and/or concealed the nature of these risks to the opinion leaders in the local medical community, to the public, Plaintiff, and to Plaintiff's physicians. The sales representative Defendants were not acting as mere conduits, because they had knowledge that the information conveyed to each opinion leader, consumer, the public and to each of Plaintiff's physician, was false.

122.    Accordingly, the sales representative defendants are liable to Plaintiff for the claims stated herein, and are fully responsible for their own personal acts and omissions whether performed for Merck or as a "frolic of their own" or otherwise. They acted for their won personal profit and "following orders" is not a defense where they acted personally in a negligent, wanton and deceitful manner.

123.    As a result of the misrepresentations, deceit, and suppression by the Defendants as set forth previously in this Complaint and as set forth below, these parties, and Plaintiff were deceived and defrauded, and as a direct and proximate result of the said deceit, fraud, misrepresentation, and fraudulent suppression the Plaintiff suffered the harm and injury as set forth in this Complaint. The conduct of the defendants described in all counts of this civil action is gross, oppressive, burdensome, willful, intentional, wanton and otherwise such as to justify the imposition of punitive damages under Alabama law.

WHEREFORE, Plaintiff demands judgment against Merck & Co., Inc., Merck Corporation, Merck Pharmaceutical Division, Robert M. Wall, Gary Harlan, Hal Henderson, Steve Santos, Patricia Aiken, Angela Finch, Sonya Coley, Jason Delk Matthew King and Defendants A, B, C, D, E, F, X and Z, whose true names are unknown to the Plaintiff but will be added by amendment when correctly ascertained, jointly and severally in such sums of compensatory and punitive damages as the jury determines to be fair, just, and lawful plus costs of Court.

HUBBARD & KNIGHT
by James S. Hubbard
Attorney for Plaintiff

HUBBARD & KNIGHT
1125 Noble Street
Anniston, Alabama 36201
(256) 237-9586

Steve Morris
Attorney for Plaintiff
P.O. Box 814
Wedowee, Alabama 36278
(256) 357-9211

JURY DEMAND

NOW COMES the Plaintiff and demands trial by jury of all issues so triable of right in this civil action.

James S. Hubbard
Attorney for Plaintiff