IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| MICHAEL D. MAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 3:05-cv-00998-MEF-SRW |
| ) | |
| MERCK & COMPANY, INC., et al., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S RESPONSE TO MOTIONS TO DISMISS
INCLUDING BRIEF AND EVIDENTIARY SUBMISSIONS**

Comes now the Plaintiff, Michael May, and shows this Honorable Court that the Motions to Dismiss filed by the local defendants should be denied and the case immediately remanded to the Circuit Court of Randolph County, Alabama, before the action can be transferred by default to the MDL. Plaintiff further shows that the Defendants' motions to dismiss and to stay pending transfer to the Vioxx MDL should not be granted. There is no federal subject matter jurisdiction in this case, as there is a clear and undeniable lack of complete diversity. This is no ordinary pharmaceutical litigation.  Instead, a great mass of evidence is available about the illicit sales tactics employed by Merck sales representatives, like the individual local defendants in this case.  Likewise, the Motions to Dismiss by the pharmaceutical sales representative Defendants should be denied.

It has been recently ruled that a company's sales representatives were not fraudulently joined in two pharmaceutical cases: *Faulk v. SmithKline Beecham Corp.*, et als. No. 2:05-cv-00085 (M.D. Ala.2005) and *Ware v. Pfizer, Inc.*, et als, No. 2:05-cv-659-T (M.D. Ala.2005). The legal issues are the same as in the motions to dismiss and on the Motion to Remand in this case. Further, Plaintiff refers to his Motion to Remand and the cases cited therein just filed in this case.

Lest this Honorable Court think for a minute that the local defendants are not proper parties we will go far beyond the ordinary recitations of the Rule 12(b)(6) standard. The facts in Vioxx litigation strongly implicate the local defendants, who are Merck's sales representatives.

The Plaintiff Has Pled Causes of Action Against the Resident Defendants Which Require Remand. The Complaint is replete with allegations against the sales representative Defendants which are dispositive of Merck's fraudulent joinder argument. The sales representatives were trained to deflect questions concerning the safety of Vioxx, and to obscure and hide the risks of the drug from the doctors they promoted it to. In each such instance, and for each resident Defendant (i.e., each sales representative), the Plaintiff alleges that this misconduct was directed to the Plaintiff's prescribing physician. (Complaint ¶¶ 14, 27, 30, 31, 56, 57, 62, 66, and Count XI (81-121)). The recent verdict in Texas shows that reasonable people can find that the subject conduct of Merck to be

actionable; this was the same conduct of its sales representatives in this case.

Plaintiff alleges that "The sales representative Defendants negligently, recklessly, intentionally and fraudulently made material representations that Vioxx was safe and effective. The sales representative Defendants represented Vioxx as safe so that the general consuming public, including Plaintiff's decedent and their physicians, would rely upon said representations when purchasing the product. The sales representative Defendants also suppressed the cardiovascular risks from prescribing physicians, and consumers such as the Plaintiff's decedent, even though they had knowledge of the risks." (Complaint, ¶ 97) The promotion was carried out by the Defendant sales representatives.

Plaintiff has alleges that the Defendant sales representatives "negligently, recklessly, intentionally and fraudulently made material representations that Vioxx was safe and effective. The sales representative Defendants represented Vioxx as safe so that the general consuming public, including Plaintiff's decedent and their physicians, would rely upon said representations when purchasing the product. The sales representative Defendants also suppressed the cardiovascular risks from prescribing physicians, and consumers such as the Plaintiff's decedent, even though they had knowledge of the risks." (Complaint, ¶ 97)

The Complaint spells out that "Merck trained its sales representatives, through programs such as the "Vioxx Obstacle Dodge Ball Program," the

"Obstacle Response Guide for Vioxx," and "Top Ten Obstacle Handlers" to misstate, conceal, and misrepresent the truly dangerous nature of Vioxx to prescribing physicians. The sales representative Defendants applied, utilized, and put into practice each of these programs with the doctors in question." (Complaint, ¶ 98) Indeed, ... "These programs were specifically designed and promulgated by Merck to mislead prescribing physicians about the life threatening side effects, including myocardial infarction and stroke, of Vioxx. Plaintiff's decedent in fact died of a Vioxx-caused stroke." (Complaint, ¶ 100), and. . . "These programs were specifically designed and promulgated by Merck to mislead prescribing physicians about the safety of Vioxx." (Complaint, ¶ 99).

Further, Plaintiff alleges: "These programs were utilized by sales representatives Wall, Harlan, Finch, King, Aiken, Henderson, Santos, Delk, and Coley to 'dodge' relevant safety questions by physicians to whom the sales representative defendants promoted and or sold Vioxx®. "to "dodge" relevant safety questions by physicians to whom promoted and or sold Vioxx. Indeed, these programs provide specific responses and representations that are to be made by Merck sales representatives to physicians during the sales calls or in response to physician questions. These Merck mandated responses misrepresented the safety of Vioxx." (Complaint, ¶ 102)

The Obstacle Dodge Ball Program was most specific in instructing sales

representatives how to respond. Take the following example: "The safety questions to be "dodged" by sales representatives, including Robert M. Wall, Gary Harlan, Hal Henderson, Steve Santos, Patricia Aiken, Matthew King, Angela Finch, Sonya Coley, Jason Delk, include, inter alia, questions such as, 'I am concerned about the cardiovascular effects of Vioxx®," and "The competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than with Celebrex." (Complaint, ¶ 103)

Again, the programs by which Merck trained its sales representatives, including these sales representative Defendants, showed the level of knowledge imputed to the sales representatives and illustrate what was provided to the representatives in order to perpetuate the sales of Vioxx: "Additional sales representative guidelines provide specific answers to physician questions/obstacles (such as those noted above) that were to be recited by sales representatives, [including Wall, Harlan, Finch, King, Aiken, Henderson, Santos, Delk, and Coley]. The top three "obstacles" listed on the sales guidelines are physician safety questions involving Vioxx® related "Cardiovascular Events." Sales representatives, [including Wall, Harlan, Finch, King, Aiken, Henderson, Santos, Delk, and Coley], are thereafter provided with specific misrepresentations to make to the concerned physicians about the safety of Vioxx®. For example, bulletins from Merck to its sales representatives state, "in response to recent

published reports about Vioxx® on May 1, 2000, we provided you with an approved verbal response to use to address customers' questions around the incidence rate of MI's [myocardial infarctions] on patients taking Vioxx® . . . " (Bulletin for Vioxx: New PIRs Relative to Vioxx GI Outcomes Research Study.) Sales representatives, such as Wall, Harlan, Finch, King, Aiken, Henderson, Santos, Delk, and Coley, were therefore required to misrepresent that Vioxx® does not increase the rate of myocardial infarctions when compared with NSAID's. This misrepresentation is false and inaccurate, yet was intentionally, knowingly, recklessly, wantonly and/or negligently made to treating physicians, including the Plaintiff's prescribing physician, by the individually named sales representatives, Wall, Harlan, Finch, King, Aiken, Henderson, Santos, Delk, and Coley." (Complaint, ¶ 104)

     Lastly, Plaintiff alleges in detail the nature of the fraud, both in the form of misrepresentation and suppression, committed by the sales representative Defendants and upon which Plaintiff's prescribing physician relied. First, " Merck and the individually named sales representatives further misrepresented the safety of Vioxx® to prescribing physicians by providing written literature to the doctors that contained false statements about Vioxx's® safety. Such literature would be forwarded to the physician who posed questions/obstacles to the sales representatives after the sales representatives had concluded their meeting with the

physician, entitled "In Response To Your Questions" (follow-up literature that misrepresents Vioxx's® cardiovascular safety) and "In Response To Your Questions: Cardiovascular System", which also misrepresents the risks associated with Vioxx®. " (Complaint ¶ 106)

Second, Sales representatives, including Wall, Harlan, Finch, King, Aiken, Henderson, Santos, Delk, and Coley, were also ordered to send follow-up letters to physicians with whom they met who had posed questions/obstacles. As the Complaint alleges: "Sales representatives, including the sales representative Defendants, were also ordered to send follow-up letters to physicians with whom they met who had posed questions/obstacles. These letters would downplay the cardiovascular risks associated with Vioxx, even though the defendants were well aware that the risks existed. (Complaint ¶ 107)

And, finally, the Complaint alleges that ". . . Plaintiff's decedent and her prescribing physician reasonably relied, to their detriment, upon the false oral and written misrepresentations of Merck, and the sales representative Defendants, concerning the safety of Vioxx and the absence of adverse cardiovascular events in users. Such reasonable reliance induced each Plaintiff's decedent's treating physician to prescribe her Vioxx and further induced the Plaintiff's decedent to utilize the dangerous drug Vioxx. As a direct and proximate result of Plaintiff's decedent's usage of Vioxx, they were injured as described herein. Such event has

caused Plaintiff's decedent's great pain and suffering, mental anguish, expense and shortened Plaintiff's decedent's life expectancy, and she died as a result." (Complaint ¶ 109).

**Merck's Internal Documents Confirm that Sales Representatives Were Trained to Mislead and Conceal Cardiovascular Risks from Physicians.**

The Motions to Dismiss involve the same contentions as Merck has alleged arguing that federal jurisdiction exists in this case because it claims its sales representatives (often called "detailmen" or "detail people") were fraudulently joined. Nothing could be further from the truth. The undisputed evidence leads to the inescapable conclusion that Merck knew of cardiovascular risks, at the latest, in 2000, and that Merck trained its sales representatives to intentionally mislead physicians including those who posed questions concerning cardiovascular side effects.

In early 1999, Merck started an 8,000 person trial referred to as the Vioxx Gastrointestinal Outcomes Research Study (VIGOR). This trial compared Vioxx with naproxen, and excluded from the group, people who had cardiovascular problems within a year of the sample.

In March, 2000, less than one year after the FDA approved Vioxx, the results of the VIGOR trial indicated that Vioxx caused *four times* as many heart attacks as naproxen. The results of the VIGOR trial caught the attention of the

FDA and many in the medical community, but Merck attempted to neutralize the results of the trial by claiming that Vioxx looked bad in comparison to naproxen because naproxen was "cardio protective," a position which credible epidemiologists would deem untenable.

In any event, following the VIGOR trial, Merck scrambled in an attempt to address concerns from prescribing physicians which would inevitably follow the results of the VIGOR trial. Merck made a conscious decision to train its sales representatives to mislead, misrepresent, conceal, and "dodge" questions from physicians about the cardiovascular risks associated with Vioxx.

Attached hereto as **Exhibit F** is a Merck internal document revealing the despicable manner in which Merck trained its sales force after the results of the VIGOR trial were announced. This document in entitled "Dodgeball Vioxx." The document lists various "obstacles" which the sales rep is trained to overcome. These "obstacles" are nothing more than the anticipated material questions of prescribing physicians. The court may recall from the diet drug litigation, that physicians heavily rely on sales representatives who are supposed to furnish accurate information regarding the properties of the drugs they detail. Physicians rely on this information in their treatment of patients.

Indeed, Judge Fallon handling the Vioxx MDL has noted the June 29, 2005 MDL hearing (transcript attached) that busy doctors rely on information about the

drugs that detail people give them (see, e.g., p. 4 of the attachment, p. 21 of the transcript excerpts).

This document is revealing because it confirms Merck's scheme to obfuscate as much as possible the issue of cardiovascular risks associated with Vioxx. Indeed, in the document, it notes the following:

> "The competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than with Celebrex."

The training manual also includes "obstacle four" which states as follows:

> "I am concerned about the cardiovascular effects of Vioxx?"

At the end of these training materials, the Merck sales representative is provided instructions on how to answer each and every question, or "obstacle" contained therein. The Merck sales representatives are instructed to "DODGE!"

On November 9, 2004, the United States Committee on Government Reform requested that Merck provide the Committee with a range of documents related to Vioxx® in preparation for the May 5, 2005 hearing on FDA and Vioxx® (in a letter from Chairman Tom Davis to Merck Chief Executive Officer Ray Gilmartin dated November 9, 2004)

A Memorandum was prepared by Rep. Henry A. Waxman to the Democratic Members of the Government Reform Committee concerning the marketing of Vioxx® to Physicians, dated May 5, 2005. Over 20,000 pages of Merck

documents were reviewed evidencing that the company used its sales force to counter the concerns of safety of Vioxx. A copy of this Memorandum is attached hereto as **Exhibit B**.

This Memorandum and Executive Summary shed further light on the distressing tactics of Merck. Nothing was left to the imagination of the sales force marketing this drug. The Executive Summary stated:

> The documents indicate that Merck instructed these representatives to show physicians a pamphlet indicating that Vioxx might be 8 to 11 times safer than other anti-inflammatory drugs, prohibited the representatives from discussing contrary studies (including those financed by Merck) that showed increased risks from Vioxx, and launched special marketing programs - named Project Xxceleration and Project Offense - to overcome the cardiovascular obstacle increased sales."

(Waxman Memorandum to Democratic Members of the Government Reform Committee, May 5, 2005, p.3)

Indeed, the 3,000 person sales force Merck used to promote Vioxx® was very well trained. The Merck training manual (Merck, *Professional Presence,* undated, attached hereto as **Exhibit G**), promoted that "gaining access and building relationships... are key to providing you the opportunity to influence your customers' behavior". Another manual, (Merck, *Selling Skills for Hospital Representatives & HIV Specialists,* undated, attached hereto as **Exhibit H** ), instructed them on how to close the deal. The materials and manuals provided the sales force was extensive, and nothing was left uncovered; other topics included selling skills (*Selling Skills* attached

as **Exhibit H**) ; using and reading nonverbal techniques ( Merck, *Captivating the Consumer,* June, 2001, attached hereto as **Exhibit I**); assessing the personality of doctors in order to determine what type of information would be most convincing to them (Merck, *Champion Selling: Milestone Leader's Guide,* January, 2002, attached hereto as **Exhibit J** ); refocusing conversations from non-business subjects to business subjects (Merck, *Planning, Conducting & Following up Successful HEL Programs,* 1999, attached as **Exhibit K**); and, detailing how to give handshakes and greetings and how to eat when dining with physicians (Merck, *Professional Presence,* undated, attached as **Exhibit G**). These examples show how determined Merck was to focus the tactics of its sales force on pushing Vioxx on all Physicians.

Merck provided its sales force with detailed instructions on a range of sensitive subjects specific to the marketing of its drugs, including Vioxx®. They were provided with specifics on individual doctors' prescribing habits and were to use this data to increase their prescribing of Merck drugs. This data was purchased from outside sources that tracked pharmacy prescriptions (Merck, *Data Sources,* May, 2003). Further, Merck could compile monthly reports on overall sales and market share for each sales representative's territory, and the representatives were instructed that their bonuses were to be based on overall sales figures (Merck*, Basic Training Participant Guide*, January, 2002, attached hereto as **Exhibit L**). The sales representatives were instructed on how to approach getting hospitals to add Merck drugs onto their

fomularies, thereby making it more likely that their products would be used (Merck, *Hospital Strategy Simulation: Roleplayers Guide*, September, 2000, attached as **Exhibit M**). Additionally, Merck also instructed its sales force on the use of speaker programs and educational events to enhance the sale of its products. The sales force knew which speakers would speak favorably about Merck's products and whether they were influential among their peers (Merck, *Specialty Foundations Participant Self-Study Workbook: Specialty Representative Advocate Development*, May, 2001, attached hereto as **Exhibit N**).

The Waxman Memorandum reviewed the series of studies and news reports, discussed previously, in depth. Throughout the Merck documents a common theme emerged; the reassurance of physicians about the safety of Vioxx by providing highly questionable and misleading information about cardiovascular risks.

a.    After the VIGOR Trial showed a five-fold increase in the risk of heart attacks for patients on Vioxx, Merck instructed its sales force to show doctors a pamphlet suggesting that Vioxx was 8 to 11 times safer than other anti-inflammatory drugs, using studies that were not appropriate for an analysis of cardiovascular safety. The sales force was issued a "new resource" "to ensure that you are well prepared to respond to questions about he cardiovascular effects of Vioxx". This was the "Cardiovascular Card". (Merck, *Bulletin for Vioxx: NEW RESOURCE: Cardiovascular Card*, April 28, 2000, attached hereto as **Exhibit O**) The data on this

card had little or no scientific validity.

b.   On May 1, 2000, Merck provided a bulletin to "all field personnel with responsibility for Vioxx". (Merck, *Bulletin for Vioxx: New Obstacle Response,* May 1, 2000, attached hereto as **Exhibit P**) This bulletin told the sales force how to respond to a competitor's argument that "Vioxx has an increased incidence of heart attacks compared to Celebrex." (Merck, *Bulletin for Vioxx)* This involved using the "Cardiovascular Card".

c.   As a result of the February 2001 meeting of the FDA Arthritis Advisory Committee, the Committee voted that doctors should be informed of the data from the VIGOR study. The next day, Merck sent another bulletin to "all field personnel with responsibility for Vioxx.", instructing them to "stay focused on the EFFICACY messages for VIOXX". (Merck, *Bulletin for Vioxx: FDA Arthritis Advisory Committee Meeting for Vioxx*, February 9, 2001, attached hereto as **Exhibit Q**) The bulletin stated:

> DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE…OR THE RESULTS OF THE…VIGOR STUDY

Sales force staff were given detailed steps to take when physicians asked about these topics.

d.   After the August 22, 2001 study published in the *Journal of the American Medical Association (*D. Mukherjee, S. Nissen, E. Topol*, Risk of Cardiovascular*

*Events Associated with Selective Cox-2 Inhibitors,* Journal of the American Medical Association, 954-9, August 22-29, 2001) which raised serious concerns about the safety of Vioxx and other drugs in the same class, Merck urged its sales force to show confidence in Vioxx's cardiovascular safety and to use the Cardiovascular Card. In light of this study, Merck Executive Jo Jerman left a voice mail for all the company's field representatives, urging them to :"Stay focused. Stay focused with your efficacy and GI risk awareness messages and stay focused with your confidence in cardiovascular safety and overall safety of Vioxx" (Merck, *MVX for Vioxx, Field Sales - USHH, Jo Jerman, August 21, 2001 "JAMA article" FINAL (approx 4 minutes),* August 21, 2001, attached hereto as **Exhibit R***).* Instead of moderating its sales approach, Merck launched a new marketing strategy, Project Offense. This strategy focused on efficacy. If "obstacles" appeared when discussing physicians, the sales force was to "quickly and effectively address all physician obstacles and return to the core message for Vioxx." (Merck, *Project Offense Meeting Agenda & Content: Representative Meetings,* 2001).

    Accordingly, the sales representative defendants are liable to the Plaintiff for the claims stated herein, and are not fraudulently joined in an attempt to defeat removal to federal court.

    It is clear from these materials that Merck and its sales force engaged in a scheme to defraud prescribing physicians, with the intent that patients not be told

about the cardiovascular risks associated with Vioxx. Merck trained its sales force to "dodge" life-saving questions from physicians. The sales force, including the individual Defendants in this case, knowingly concealed and misrepresented the cardiovascular risks of Vioxx from prescribing physicians.

Far from being entitled to a Rule 12(b)(6) dismissal or being considered fraudulently joined, the sales representatives who participated in this scheme are liable under numerous common law causes of action in Alabama. These sales representatives were not duped by Merck. They willingly participated in this sordid scheme.

The Motions to Dismiss should be denied under Rule 12(b)(6) and Merck's claim of fraudulent joinder should be rejected forthwith, and this action is due to be remanded to state court.

        /s/ Thomas J. Knight
        Thomas J. Knight
        Attorney for Plaintiff

OF COUNSEL:
HUBBARD & KNIGHT
P.O. Drawer 1850
Anniston, Alabama 36202
(256) 237-9586

CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

George Robert Parker
Philip Henry Butler
William Claude McGowin
Bradley Arant Rose & White LLP
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
334-956-7607

                                          /s/ Thomas J. Knight
                                          Thomas J. Knight
                                          Attorney for Plaintiff