# HOSPITAL STRATEGY

## Simulation

### Roleplayer's Guide
### September, 2000



Confidential - Subject To Protective
Order

MRK-AAR0049752

*** Slip Sheet ***

Child

Instructions

Confidential - Subject To Protective
Order

MRK-AAR0049753



## Roleplayer Instructions

### Materials Needed

- *Roleplayer's Guide* (this document), including hospital profile, plot narrative, and Customer Profile cards
- *Participant's Guide*, including instructions and customer profile cards
- Participant/Team Evaluation Checklists

### How to Prepare for Roleplaying

| Materials | How to Prepare |
|---|---|
| *Roleplayer's Guide* | |
| - Memorial Hospital profile | 1. *Review* the hospital profile. |
| - Plot narrative | 2. *Read* the plot narrative, for a more detailed overview of the relationships underlying the simulation. |
| | *Note that very few details of the plot are included on the participant version of the Customer Profile cards. Therefore, the plot narrative should not be revealed to the participants.* |
| - Customer Profile cards | 3. *Locate* and *read* the profiles for the department and customers you have been assigned to roleplay. |
| | 4. *Review* only the Customer Profiles for the department you will represent. If your Customer Profile cards refer to an existing relationship with customers in other departments (e.g., Dr. Tang in Internal Medicine holds a bone disease clinic with Dr. Sholing in Endocrinology) *review* these related profile cards as well. |
| | *Note that the information in the participant's version of the Customer Profile may not always be consistent with the information on your cards.* |
| | *Note that the Customer Profile cards for the Pharmacy and the Satellite Pharmacy are identical. This is to avoid a backup of teams all choosing to call on Pharmacy for their first appointments.* |

Confidential - Subject To Protective Order

MRK-AAR0049754

| Materials | How to Prepare |
|---|---|
| *Roleplayer's Guide (cont.)* | |
| • Customer Profile cards | *Note that irrespective of which product representatives are promoting, all representatives are required to call on Pharmacy and Emergency Medicine. To simplify the plot for the roleplayers, there are Pharmacy Customer Profile cards for representatives for Aggrastat and Pharmacy Customer Profile cards for representatives for Vioxx. Similarly, there are Emergency Medicine Customer Profile cards for representatives for Aggrastat and Emergency Medicine Customer Profile cards for representatives for Vioxx.* |
| | *Note that for some customers the information that you can reveal and what you can agree to in the call differs depending on whether this is the first , second or third call a team is making to you. There is some information customers for Vioxx (specifically those who can write a Preferred Status Request Letter) can only reveal the second time a team calls on the customer. This information is presented in **bold, italic** type on the Customer Profile card. Preferred Status Request Letters may only be given on the second call. There is some information customers for Aggrastat can only reveal the second and third time a team calls on the customer. Second call information is presented in **bold, italic** type on the Customer Profile card. Third call information is presented in ordinary type on the Customer Profile card.* |
| | 5. *Review* the product-related question on each Customer Profile Card (see "Say/Ask the Representative") before you roleplay that customer. Each representative for Vioxx will have to address one question/comment. Each representative for Aggrastat will have to address up to three questions/comments. Each question or comment will test the representative's ability to deal with obstacles. Each question or comment has been selected to fit the profile of the customer, for example, Dr. Avery in Emergency Medicine is concerned about the safety profile of GP IIb/IIIa platelet inhibitors and will ask the representative about the incidence of bleeding episodes associated with Aggrastat. Use your judgement to decide when to ask the question or make the comment to the representative. |
| | 6. *Be prepared* to play the role of any of the customers in your department as requested by the team/participant when they begin the appointment. |

Confidential - Subject To Protective Order

MRK-AAR0049755

| Materials | How to Prepare |
|---|---|
| *Participant's Guide* | 1. *Read* the instructions and the participant version of the Customer Profile cards. |
| | 2. *Review* the participants' objectives for the simulation, paying particular attention to how much information they are presented for each customer and how this differs from your customer profiles. |
| | *Note that the main objective for representatives for Vioxx is to upgrade the formulary status of Vioxx to preferred agent that specifically inhibits COX-2. They can only achieve this objective by gaining the commitment of 4 physicians of at least Attending Physician designation to write preferred Status Request Letters to Dr. Nettles, the Directory of Pharmacy Services.* |
| | *Note that the objective for representatives for Aggrastat is to gain the commitment of the Cardiologists to include Aggrastat as the exclusive short-acting GP IIb/IIIa platelet inhibitor in an Unstable Angina Treatment Protocol for use in Emergency Medicine.* |
| | 3. *Attend* the introduction to the simulation for the participants. |
| Participant/Team Evaluation Checklists | 1. *Locate* and *read* the Participant/Team Evaluation Checklists to familiarize yourself with the parameters against which individual participants and teams will be evaluated. |

### Roleplay Guidelines

- When performing each roleplay, try to stay within character as described in the profile. *It is important that you be consistent in the way you roleplay each customer.* No profile has been designed to be especially difficult for the participants.

- Be realistic about the time for each roleplay. Based on their profile and position in the department, some customers will only spare a few minutes; others will offer more time.

Confidential - Subject To Protective Order

MRK-AAR0049756

- Note that each appointment slot is for representatives for Vioxx is 10 minutes in length and 20 minutes in length for representatives for Aggrastat. The team observers are responsible for helping you remain aware of this timeframe. If a team completes a call on one specific customer within a department in less than the allotted time, the team may use the balance of the time to ask to roleplay with a different customer from the same department. This transition from one customer to another will need to take place very quickly on your part.

- If the customer you are portraying is described as friendly and open, initiate the conversation with topics such as vacations, hobbies, etc. Do not prompt the participant to begin the "business"; he or she will need to lead you into it.

- If the customer is the considered, analytical type, do not initiate any conversation. Use one- or two-word answers for any questions the participant asks you. If the participant is very good at questioning, you can open up a little.

- If you are playing a customer who likes new things, stick with the subject of "newness." You may want to ask about other R & D products that Merck is developing.

- If the profile describes you as controlling, efficient, or domineering, get down to business immediately. State that you only have a few minutes for the call, and stick to it.

- If the representative asks you for information that the profile card does not allow you to reveal, say "I'm not aware of that," or "I don't have that information," or "I can't answer that at this time." Use this type of reply rather than trying to invent or expand on the profile information. It is preferable to "step out" of the simulation of a real call to this extent and refer deliberately to not having or not being able to provide information, rather than "overcueing" the participants by providing too much information.

Confidential - Subject To Protective Order

MRK-AAR0049757

- Remember that participants have been specifically directed to play detective and dig for information in addition to selling Vioxx and Aggrastat. They will probe for information about the customer's prescribing, about the prescribing of the customer's colleagues, and any other physicians with whom the customer has a working relationship. For example, Dr. Ingle in Orthopedic Surgery works closely with a Clinical Pharmacist and an anesthetist in PACU; the representative should ask Dr. Ingle about these collaborations. This means that representatives may start the call with very direct questions — no small talk — on purpose. This is appropriate. Your communication style and the information you respond with should be governed by the profile card of the customer you are playing at that time.

- If representatives for Vioxx ask for a *Preferred Status Request Letter* inappropriately (i.e., on the first call, or without having asked any other questions), decline by saying "I won't be able to do that for you at this time." Note that those customers who can provide a *Preferred Status Request Letter* in each department are *only* directed to do so in the second call by a given team. Potential letter writers should not write a *Preferred Status Request Letter* except in response to a specific request (e.g., "Doctor, will you write a letter to Pharmacy requesting preferred status on formulary for Vioxx?").

- If representatives for Aggrastat ask for inclusion of Aggrastat in an *Unstable Angina Treatment Protocol* inappropriately (i.e., on the first call, or without having asked any other questions, or for non-high-risk unstable angina patients), decline by saying "I won't be able to do that for you at this time." Note that those customers who can commit to including Aggrastat in an *Unstable Angina Treatment Protocol* in each department are *only* directed to do so in the third call by a given team. Potential advocates for Aggrastat should not agree to include Aggrastat in an *Unstable Angina Treatment Protocol* except in response to a specific request (e.g., "Doctor, will you include Aggrastat in an *Unstable Angina Treatment Protocol* for use in Emergency Medicine?).

*Roleplayer's Guide, Instructions*

5

Confidential - Subject To Protective Order

MRK-AAR0049758

## Hospital Profile, Memorial Hospital

### General Information

| Priority: High | Type: Teaching | |
|---|---|---|
| Address:<br>123 Main St.<br>New York, USA | Tel #: 984-111-2222<br>Fax #: 984-111-2233<br>E mail: mem@hosp.com<br>Web site: none | Number of beds: 1,400 |
| Outpatient centers:<br>Memorial Clinic | Associated hospitals:<br>St. Jude's (maternity) | Sign-in procedure: At pharmacy, ask for book |
| Switchboard staff: Joe, Helen | Reception: Maria, Courtney | Paging procedure: Use black phones; Dial 9, then the page number; Then replace the handset |

### P & T Committee Members

| Name | Specialty | Access |
|---|---|---|
| 1. Dr. Nettles | Director of Pharmacy | Appt |
| 2. Dr. Joplin | General Surgery | Operating suite (not profiled) |
| 3. Dr. House | Rheumatology | Department meetings |
| 4. Dr. Ovenden | Hematology | Appt (not profiled) |
| 5. Dr. Omerod | Pharmacology | Appt (not profiled) |
| 6. Dr. Jackson | Internal Medicine | Appt |
| 7. Dr. Guidry | Endocrinology | Appt |
| 8. Layperson | | |

Confidential - Subject To Protective Order

MRK-AAR0049759

*P & T Committee Meetings*

| Frequency: 2 per year | Time: 1st Monday in February and July | Place: Usually seminar room 108b |
|---|---|---|
| Procedure for formulary inclusion (existing products): Sponsor must present clinical data to committee and complete forms | Procedure for new product introduction: Can replace an old product or be added; Sponsor must be at least a Fellow; Forms are obtained in the pharmacy | Procedure for formulary status upgrade to "preferred" status: Written requests to the Director of Pharmacy must be obtained from four physicians of at least Attending Physician designation. |

*Departments*

| Specialty | Department Chief |
|---|---|
| Pharmacy | Dr. Nettles |
| Satellite Pharmacy | Dr. Nettles |
| Orthopedic Surgery | Dr. Moran |
| Emergency Medicine | Dr. Avery |
| Rheumatology | Dr. Randolph |
| Endocrinology | Dr. Guidry |
| Internal Medicine | Dr. Jackson |
| Anesthesiology | Dr. Kalms |
| Cardiology | Dr. Stanley |
| • Catheter Laboratory | Dr. Omey |
| • Coronary Care Unit | Dr. Jensen |
| Nursing | Nurse Kildaire |
| Oncology | Dr. DeVita |

*Roleplayer's Guide, Instructions*                                          7

Confidential - Subject To Protective Order                                          MRK-AAR0049760



## Hospital Strategy Simulation:
Previous Plot Summary

The last time you worked in Memorial Hospital, your objective was to act as a "detective" and discover which customers were potential formulary sponsors for Vioxx. Once you evaluated these key customers, you had to gain their commitment to act as formulary sponsors for Vioxx.

What follows is a synopsis of the influences and power structures that existed in each department. It will also remind you which physicians agreed to act as formulary sponsors for Vioxx.

### Pharmacy

Ms. Amos was the extremely friendly Resident in Pharmacy. While she had no power or influence, she proved to be a good source of information about her colleagues in the Pharmacy and other physicians who were important for Vioxx. A call to Ms. Amos taught two valuable lessons: the importance of leaving no stone unturned, and the fact that all personnel in the hospital are potentially useful to you.

Mr. Filan was the tight-lipped Purchasing Pharmacist. He monitored each department's expenditure on drugs and sent monthly updates about this to Dr. Nettles, the Director of Pharmacy Services. Mr. Filan came across as a closed book, and you had to probe very skillfully to extract information from him.

Dr. Nettles was the cost-conscious Director of Pharmacy Services. Dr. Nettles was particularly important because she sat on the P & T Committee. Her first question to you was: "who are you seeing in my hospital, what are you selling, and for which patients?" It was Dr. Nettles' opinion that agents that specifically inhibit COX-2 were just the latest addition to a long list of budget-busters currently used at Memorial Hospital.

Dr. Nettles circulated a memo to all hospital staff underlining the efficacy and cost-effectiveness of generic NSAIDs. In it she stated that COX-2 inhibitors were "just expensive NSAIDs."

Dr. Svanold, the Pharm D., had a close working relationship with Dr. Ingle in Orthopedic Surgery. She revealed useful information about this department's general approach to the management of acute pain.

Confidential - Subject To Protective Order

MRK-AAR0049761

Dr. Nettles agreed to listen to an argument in favor of formulary approval for Vioxx, but only if it was strictly reserved for elderly patients with acute pain and inflammation who have a documented history of NSAID-induced GI bleeds. You had to be aware of the fact that Dr. Nettles tried to niche Vioxx; this would have prevented you from realizing its full potential.

It was important to quell any fears about Vioxx being a budget-buster, and instead approach other opinion leaders, such as Dr. Helmann (the Attending Physician in the Pain Clinic) and Dr. Tang (the Attending Physician in Internal Medicine), to act as advocates for Vioxx. You had to achieve this without making Dr. Nettles feel duped.

It was important that you called on enough members of the pharmacy so that any potential opposition to Vioxx was neutralized.

*No one in Pharmacy could give a Formulary Sponsor Card.*

## Orthopedic Surgery

In Orthopedic Surgery, the drug of choice for acute pain was a narcotic analgesic. Some patients received narcotics for up to 5 days post-operatively, a practice that Dr. Heinz, a Research Fellow in the department, was not happy about. The fact that narcotic use was high in Orthopedic Surgery was important information, as it provided you with the opportunity to win new business for Vioxx.

Dr. Ingle, the ambitious Attending Physician in the department, wanted sponsorship to enable him to attend a major symposium in Sydney, Australia later in the year. He was willing to act as a sponsor for Vioxx if you offered to help him attend the meeting.

The department chief, Dr. Moran, devised the "Moran knee prosthesis." As a "traveling lecturer," she was sponsored by several companies to speak at various national and international symposia. Although she was away a lot, she indicated to you that the other physicians in her team could handle an assessment of Vioxx in her absence. Dr. Moran played golf with Dr. Randolph (Chief, Rheumatology) and provided you with the opportunity to gain soft support for Vioxx. Dr. Moran was willing to act as a formulary sponsor.

Dr. Peters was busy studying for exams and was unwilling to make any commitment to you.

Confidential - Subject To Protective Order

MRK-AAR0049762

Dr. Zagni was the third-year Resident who recently arrived from
Emergency Medicine. If you probed about her last rotation, she
revealed useful information about the influence of Dr. Payne and
Nurse Munson (both in Emergency Medicine).

*Dr. Moran was willing to act as formulary sponsor.*

## Emergency Medicine

Dr. Avery, chief of Emergency Medicine, was willing to act as a
sponsor for Vioxx provided it was assessed first.

Dr. Lo, the Intern in the department, was firmly convinced of the
benefits of Vioxx and agreed to prescribe it first-line for acute pain. It
was unfortunate that Dr. Lo was leaving the department in a few
weeks to take up a new post at another hospital.

One of the key players in this department was the senior trauma
nurse, Nurse Munson. You were able to find out that she had the ear
of Dr. Avery and that she was seen by many as running the
department. Nurse Munson was very involved with analgesia in the
department and initiated a follow-up program for patients in the
community who were taking painkillers.

The ambitious young Attending Physician, Dr. Orlowski, was new to
the department. Many of his colleagues saw him as an upstart. Dr.
Orlowski did not get along with Nurse Munson; Nurse Munson
thought he was "rocking the boat," and he did not like the power she
wielded.

Although you could have approached Dr. Orlowski to be a formulary
sponsor for Vioxx (he was more than willing), this would have been a
mistake, since Nurse Munson would have sabotaged the application
through her influence on Dr. Avery.

Dr. Payne, a Resident in the department, got along well with Nurse
Munson and was loyal to Dr. Avery. Dr. Avery was happy to
sanction sponsorship if both Dr. Payne and Nurse Munson were
involved with an assessment of Vioxx.

Dr. Treveena, another Resident in the department, agreed to sponsor
Vioxx. However, you will have noticed early in the sales call that he
was a "yes man" and would not deliver on any promises about being
a formulary sponsor for Vioxx.

*Dr. Avery was willing to act as formulary sponsor.*

Confidential - Subject To Protective
Order

MRK-AAR0049763

## Rheumatology

Dr. Hannah, one of the Attending Physicians in Rheumatology, was very skeptical about new products and felt that agents that specifically inhibited COX-2 were not "tried and tested." It was difficult to change Dr. Hannah's belief that ibuprofen was adequate for treating pain and inflammation, but he did agree to review the clinical data supporting Vioxx.

Dr. House, the other Attending Physician in the department, was a member of the P & T Committee. She was obviously an independent thinker who was able to make considered decisions. She was very ethical in her approach and told you that she considered product sponsorship and her role on the P & T Committee to be incompatible. Dr. House, therefore, would not act as a sponsor, but it was nevertheless very important to gain her support for Vioxx. Dr. House thought that agents that specifically inhibit COX-2 had a valid place in the management of pain and inflammation, but would give soft support for Vioxx only if you had won a sponsor card from another physician.

Dr. Lee was a new resident who recently rotated from the ER. Dr. Lee was too junior to be a sponsor, but he indicated that he would like to be involved with any Vioxx trial. Dr. Lee suggested that Dr. House and Dr. Randolph might be good contacts for you. He also revealed information about the power structure within Emergency Medicine, specifically that Dr. Payne and Nurse Munson were good contacts.

Dr. Mason was the ambitious Chief Resident who was heavily involved in the department's trials program. She wanted to see the clinical data supporting Vioxx before she would offer support.

Dr. Miles was the friendly and open Fellow in the department. His patients adored him because he was kind. He agreed to act as a sponsor for Vioxx, but warning bells will have sounded when you noticed that he was a bad timekeeper and highly disorganized. Dr. Miles would have been a poor choice of product sponsor because he could not say "no" and would have had difficulty completing the formulary application.

Dr. Randolph, chief of Rheumatology, was very interested in the concept of COX-2 selectivity. He was willing to support Vioxx, provided that another senior physician made the formulary application. Dr. Randolph revealed his colleague Dr. House as a potential supporter, not sponsor, for Vioxx. You will have found out that Dr. Randolph did not get along with Dr. Helmann (Pain Clinic), and so you could not use Dr. Randolph to help gain her support.

*No one in Rheumatology was willing to act as formulary sponsor, but support could be gained.*

Confidential - Subject To Protective Order

MRK-AAR0049764

### Endocrinology

One of the biggest potential uses for Vioxx in the department of Endocrinology was to treat pain resulting from vertebral fractures associated with osteoporosis, which occur in the context of the menopause, secondary to diabetes, or following corticosteroid use.

Mr. Andrews, the Physician Assistant, had a lot of patient contact and could help identify patients suffering from pain and NSAID-related GI side effects. He also gave information about the weekly bone clinic held by Dr. Tang (Internal Medicine) and Dr. Sholing for patients with bone disease. Mr. Andrews suggested you call on Dr. Sholing in this department and Dr. Helmann in the Pain Clinic.

Budget control was a major concern for Dr. Guidry, the Department Chief and member of the P & T Committee. Dr. Guidry told you that Dr. Jackson's department (Internal Medicine) over-uses NSAIDs and prescribes them inappropriately to people at high risk for GI hemorrhage and ulceration. Dr. Guidry's department receives many referrals from Internal Medicine, and Dr. Guidry was open to having a joint meeting with Dr. Jackson's department in order to address this inappropriate prescribing PATTERN. Dr. Guidry agreed that there was an important role for Vioxx in the management of patients with pain and inflammation.

Dr. Kattering was not good at making decisions. He wanted to know what Dr. Guidry and Dr. Sholing thought about Vioxx. He agreed that Vioxx was a useful product and said he would consider trial usage.

Dr. Sholing told you he received a mailing about agents that specifically inhibit COX-2 and said he was impressed with the presumed benefits they offer. Dr. Sholing prescribes a lot of analgesics in patients with vertebral fractures due to osteoporosis. He also told you about the weekly bone clinic he holds with Dr. Tang in Internal Medicine; they treat patients with vertebral diseases, many of which are painful. Dr. Sholing agreed to persuade Dr. Guidry to review the literature on Vioxx. He also agreed to give soft support for a formulary application for Vioxx, as long as you persuaded Dr. Tang (Internal Medicine) to act as a sponsor for Vioxx.

Dr. Wiltz did not have a very positive attitude toward the pharmaceutical industry and told you that she believed the high cost of drugs was mostly due to the cost of the advertising that promotes them. It was important to remember that Dr. Wiltz's unwillingness to prescribe Vioxx did not mean she did not have need for it; this physician may therefore present an opportunity in the future.

*No one in Endocrinology was willing to act as a formulary sponsor, but support could be gained.*

Confidential - Subject To Protective Order

MRK-AAR0049765

## Pain Clinic

The Senior Nurse Practitioner in the Pain Clinic, Nurse Berger, told you that she liked the convenience of the once-daily dosing of Vioxx. She was important because she developed individualized pain management strategies for patients. She told you that Dr. Randolph (Rheumatology) and Dr. Helmann did not see eye to eye. She suggested you call on her colleague, Dr. O'Mara, and she agreed to speak with Dr. Helmann about the possibility of including Vioxx in Dr. Helmann's pain management guidelines.

Dr. Crisp, chief of the Pain Clinic, expressed concerns about containing the cost of running the department. He suggested you call on Nurse Berger to discuss Vioxx.

You were able to find out that Dr. Helmann, the Attending Physician in the Pain Clinic, receives referrals from colleagues within the hospital and from surrounding centers. She was clearly an expert on the management of pain and wrote the popular undergraduate text book *Advances in Pain Management*. She built a co-operative and cross-disciplinary working relationship with a number of colleagues in the hospital, including Dr. Sholing (Endocrinology) and Dr. Tang (Internal Medicine). Dr. Helmann agreed to act as a formulary sponsor for Vioxx and to consider including it in her pain management guidelines.

Both Dr. O'Mara and Nurse Berger regarded Dr. Helmann as their mentor; the three individuals had an excellent working relationship. Dr. O'Mara gave you a good lead about Dr. Sholing, suggesting that he may be an advocate for Vioxx. Dr. O'Mara also agreed to discuss with Dr. Helmann the possibility of including Vioxx in Dr. Helmann's pain management guidelines for the hospital.

Dr. Randolph did one session a week in the Pain Clinic, but it was not possible to persuade Dr. Helmann to positively influence Dr. Randolph as the two physicians did not get along.

You had to unearth the good working relationship that existed between Dr. Helmann, Dr. O'Mara, and Nurse Practitioner Berger, and their power to influence one another.

*Dr. Helmann was willing to act as a formulary sponsor.*

Confidential - Subject To Protective Order

MRK-AAR0049766

## Internal Medicine

Dr. Griffiths, the Chief Resident in Internal Medicine, told you that the Department Chief, Dr. Jackson, prescribes generically to contain drug costs in the department. Dr. Griffiths also revealed that Nurse Hardy acted as the gatekeeper for the department, dictating which representatives would, and which representatives would not, see Dr. Jackson. Dr. Griffiths agreed to speak in favor of Vioxx to her roommate, Dr. Zagni (Orthopedic Surgery).

Nurse Hardy was very protective of Dr. Jackson and told you that there was no point in detailing Vioxx, as Dr. Jackson nearly always prescribes generic products. Only a convincing Vioxx detail to Nurse Hardy that persuaded him of the benefits of Vioxx opened the door to Dr. Jackson. If you probed Nurse Hardy about Dr. Tang, he would have revealed that Dr. Tang is important because he dictates the informal prescribing policy in the department. Nurse Hardy also suggested that Dr. Sholing, who works with Dr. Tang, might be interested in Vioxx.

As well as being chief of the department, Dr. Jackson was a member of the P & T Committee. Though he said he prescribed generic products whenever possible, he was open to the benefits of Vioxx and suggested you call on Dr. Tang. If you convinced Dr. Jackson of the benefits of Vioxx, he agreed to ask Dr. Tang to assess Vioxx in NSAID-intolerant patients.

The key mover and shaker in the department was Dr. Tang, the ambitious Attending Physician who had considerable influence over Dr. Jackson. He expressed an interest in the mechanism of COX-2 selectivity and revealed, if you probed, that he had prescribed Celebrex but was unhappy with its safety profile. Together with Dr. Sholing in Endocrinology, Dr. Tang told you he referred patients to Dr. Helmann in the Pain Clinic.

Provided you had seen Dr. Jackson, Dr. Tang agreed to speak to Dr. Sholing (Endocrinology) about conducting a trial on Vioxx before applying for formulary inclusion.

*Dr. Tang was willing to act as a formulary sponsor.*

Confidential - Subject To Protective Order

MRK-AAR0049767

*** Slip Sheet ***

Child

Plot

Confidential - Subject To Protective
Order



**Hospital Strategy Simulation:**
Current Plot Profile

*Important Note:* This outline of the simulated scenario within each department is provided for your information only. Do NOT present this information to the participants.

### Pharmacy (Vioxx)

Ms. Amos is an extremely friendly Pharmacy Resident. She makes it her business to know the politics at play in each department and can pinpoint some of the key physicians in departments that are targets for Vioxx and Aggrastat. Probing Ms. Amos will reveal that Dr. Svanold, the Clinical Pharmacist, can influence Dr. Nettles, the Principal Pharmacist; that the representative for Celebrex "always seems to be calling" on Dr. Randolph, Chief of Rheumatology; and that Dr. McKenzie, another Clinical Pharmacist, is highly respected by his colleagues in Cardiology.

It appears that Ms. Amos has no direct power or influence on prescribing decisions in the hospital. However, as editor of the monthly *Adverse Event Alert*, the drug-related adverse event notification system in Memorial Hospital, she is in control of a potentially powerful tool. In view of this, representatives should take the opportunity to show the evidence for the safety and tolerability profiles of Vioxx and Aggrastat.

Her position as editor of this bulletin becomes important when representatives hear anecdotal reports of adverse events associated with competitor drugs. Representatives should ask Ms. Amos to report these adverse events in the next edition of the bulletin. Since they need her cooperation, representatives should treat Ms. Amos as they would any important physician in the hospital. A colleague of Ms. Amos, the Clinical Pharmacist, Dr. Svanold, is the only person who can reveal that she is the editor of the bulletin.

Mr. Filan, the tight-lipped Purchasing Pharmacist is so concerned about containing drug expenditure that he is known by many of his colleagues in Medicine as "penny pincher". He continues to scrutinize each department's expenditure on drugs and prides himself on the detailed summaries he provides to the Principal Pharmacist,
Dr. Nettles.

Confidential - Subject To Protective Order

MRK-AAR0049769

The objective of calls to Mr. Filan is to make a solid pharmacoeconomic case for upgrade to the formulary status of Vioxx to preferred agent that specifically inhibits COX-2. The representative therefore needs to extract details of departmental expenditure on analgesics, NSAIDs, $H_2$ antagonists and proton pump inhibitors [Data to be supplied by Merck]. In a first call Mr. Filan can provide this data for the hospital as a whole. In a second call, Mr. Filan can provide this data for Orthopedic Surgery, Rheumatology, Anesthesiology and Emergency Medicine.

Dr. McKenzie, a Clinical Pharmacist who works closely with the Cardiologists in the Cath Lab and Coronary Care Unit (CCU) is the key player in Pharmacy for Aggrastat. He is an expert on cardiac drugs and is highly respected by his colleagues in Cardiology. He should be approached by the representative for Aggrastat early on as he can reveal important information about the management of unstable angina in the Cath Lab, CCU and Emergency Medicine.

The representative will have to convince Dr. McKenzie of the benefits of Aggrastat, because the Cardiologists will want to know that he is in favor of naming Aggrastat as the exclusive short-acting GP IIb/IIIa platelet inhibitor on the hospital formulary.

Dr. Nettles is the cost-conscious Director of Pharmacy Services and a member of the P &T Committee. The first question she will ask the representative is: "who are you seeing in *my* hospital, what are you selling, and for which patients?" She has written to all the chiefs of department requesting a reduction in their expenditure on drugs.

Dr. Nettles must receive four *Preferred Status Request Letters* for Vioxx from physicians of at least Attending Physician designation, and only she can reveal this. If the other pharmacists are asked about the procedure for upgrading the formulary status of Vioxx, they will tell the representatives to speak to Dr. Nettles about that. This means that each team must call on Dr. Nettles. Dr. Nettles is influenced by Mr. Filan, Dr. McKenzie and Dr. Svanold, another Clinical Pharmacist in the hospital.

Dr. Svanold is the key player in Pharmacy for the Vioxx representative since she works closely with a number of departments that are targets for Vioxx, including the Department of Orthopedic Surgery, and the Pain Clinic, which is part of the Department of Anesthesiology.

If representatives probe Dr. Svanold about these links, she will hint that Dr. Ingle in Orthopedic Surgery might write a letter for Vioxx. This hint is useful because it means that there may be two letter writers in Orthopedic Surgery, Dr. Ingle and Dr. Moran, who, as previous formulary sponsor for Vioxx, should automatically be a target for the representative.

Confidential - Subject To Protective Order

MRK-AAR0049770

Dr. Svanold will ask the representative about the use of Vioxx in patients with sulfa allergies and will reveal that she recently had two reports of sulfa-type allergies in patients in Orthopedic Surgery receiving Celebrex. Probing will reveal that Ms. Amos edits the *Adverse Event Alert*. If asked, Dr. Svanold will tell Ms. Amos to include these adverse events in the next edition of the bulletin. Dr. Svanold will be cagey about which physicians reported the sulfa-type allergies, so the representative will have to find out about this from another source.

An ideal approach for the representative for Vioxx in Pharmacy would be to start by gathering information from Ms. Amos. Ms. Amos will reveal a piece of information relevant to Aggrastat to the representative for Vioxx, and a piece of information relevant to Vioxx to the representative for Aggrastat. This means that representatives will need to listen carefully for comments about their colleague's product and communicate them accurately.

Next, the representative should pay a visit to Dr. Nettles, and find out that four letters are required for upgrade to the formulary status of Vioxx.

Then, the representative should call on Dr. Svanold in order to gain her support for upgrade to the formulary status of Vioxx. Successful probing of Dr. Svanold will help the representative identify both positive and negative influences on business for Vioxx in relevant departments. This will enable the representative to identify and approach potential letter writers for upgrade of the formulary status of Vioxx and identify and neutralize physicians (such as Dr. Randolph in Rheumatology) that could block it. At the same time, Mr. Filan will have to be presented with a good pharmacoeconomic argument for nominating Vioxx as the preferred agent on formulary that specifically inhibits COX-2.

The representative will need to return to both Mr. Filan and Dr. Nettles to convince them of the pharmacoeconomic case for Vioxx.

It is important that representatives call on enough members of the pharmacy so that any potential opposition to Vioxx and Aggrastat and is neutralized.

Ms. Amos — Dr. Nettles — Dr. Svanold — Mr. Filan — Dr. Nettles — Mr. Filan — Dr. Svanold.

*No one in Pharmacy can write a Preferred Status Request Letter.*

Confidential - Subject To Protective Order

## Pharmacy (Aggrastat)

The most influential person in Pharmacy for the representative for Aggrastat is Dr. McKenzie. He is highly respected by the Cardiologists, who value his drug and clinical trial reviews.

The representative must obtain Dr. McKenzie's agreement to review clinical data for Aggrastat for the Cardiologists and physicians in Emergency Medicine.

Ms. Amos, the Pharmacy Resident, can reveal Dr. McKenzie's influence with the Cardiologists. She will also comment that the representative for Integrilin "always seems to be calling" on Dr. Hartley, a hint that Integrilin is being prescribed in CCU.

Mr. Filan, the Purchasing Pharmacist, regularly updates Dr. Stanley, (Department Chief, Cardiology) Dr. Omey (Director, Cath Lab) and Dr. Jensen (Director, CCU), on drug expenditure in their departments.

Mr. Filan is very concerned about the expenditure on ReoPro. If the representative can convince him that prescribing of Aggrastat in Emergency Medicine would reduce the total cardiology drug bill, Mr. Filan, for once, would be a happy man. His enthusiasm shows through when he reveals in a second call that Dr. McKenzie's review of Aggrastat "looks impressive".

Dr. McKenzie will reveal during a first call that the physicians in the Cath Lab "like to keep their options open". If probed, he will reveal that ReoPro is prescribed in the Cath Lab and Integrilin is prescribed in CCU in patients not suitable for revascularization.

Dr. McKenzie can reveal that Ms. Amos edits the *Adverse Event Alert*; this becomes relevant when the representative discovers the intracranial bleed associated with Integrilin that occurred in Emergency Medicine. The representative has the opportunity to call back on Ms. Amos and ask her to publish the details of the IC bleed in the next edition of the bulletin.

Dr. McKenzie will summarize his review of Aggrastat by stating that the data supporting Aggrastat is stronger than the data supporting Integrilin. If the representative asks, Dr. McKenzie will agree to recommend Aggrastat as the preferred GP IIb/IIIa platelet inhibitor to the Cardiologists.

Dr. Nettles is the Director of Pharmacy Services. Although he plays a small role in the plot for Aggrastat, he expects a full detail and will ask the representatives about their plans for the hospital.

Confidential - Subject To Protective Order

MRK-AAR0049772

Dr. Svanold, a Clinical Pharmacist, is the final member of the department. Her links are with Orthopedic Surgery, so she is a target for the representative for Vioxx. If representatives for Aggrastat call on Dr. Svanold, she will direct them to Dr. McKenzie.

The ideal approach for the representative for Aggrastat in Pharmacy is to pay a courtesy call on Dr. Nettles, and quell any fears he may have about the cost of widespread prescribing of Aggrastat by Cardiology and Emergency Medicine.

Next, the representative should call on Ms. Amos and Mr. Filan to gather as much information as possible before calling on Dr. McKenzie.

If the representative does a thorough review of the Aggrastat clinical reprints with Dr. McKenzie, he will agree to review Aggrastat and to circulate his report to the physicians in Cardiology and Emergency Medicine. Finally, Dr. McKenzie can be persuaded to recommend Aggrastat as the preferred GP IIb/IIIa platelet inhibitor to the Cardiologists and the physicians in Emergency Medicine.

Since Dr. Svanold works closely with the Orthopedic Surgeons, the representative for Aggrastat should not waste time calling on her.

Dr. Nettles — Ms. Amos — Mr. Filan — Dr. McKenzie — Mr. Filan — Dr. McKenzie

## Orthopedic Surgery

The physicians in Orthopedic Surgery prescribe a wide range of analgesics, including agents that specifically inhibit COX-2. Dr. Moran, Chief of Orthopedic Surgery, acted as a formulary sponsor for Vioxx and continues to be a Vioxx (and Celebrex) prescriber.

Dr. Heinz, the cost-conscious Fellow in Orthopedic Surgery prescribes Celebrex and Vioxx so that post-operative patients can be taken off narcotics as early as possible. Dr. Heinz has recently started prescribing Mobic because he has been told that it is not only an agent that specifically inhibits COX-2, but is also less expensive than Vioxx.

The representative needs to address these two misconceptions. If probed, Dr. Heinz will reveal information about the working relationships that exist between the two key players in Orthopedic Surgery, Dr. Moran, and Dr. Ingle, and physicians from other departments who are important to the prescribing of Vioxx.

Confidential - Subject To Protective Order

MRK-AAR0049773

Dr. Ingle, the Attending Physician in Orthopedic Surgery, has encouraged the reduction in the prescribing of narcotics in his department because of their cost and adverse effects. The use of agents that specifically inhibit COX-2, both Celebrex and Vioxx, is therefore increasing in his department.

Dr. Ingle is concerned about the potential edema that occurs with Vioxx 50 mg and therefore reserves Celebrex for patients with renal disease. The representative needs to provide the data that will assure Dr. Ingle of the good safety profile of Vioxx. Addressing Dr. Ingle's concerns is important because he is influential with his colleagues in the department and, in Dr. Moran's absence, dictates the department's strategy for the management of pain.

If probed, Dr. Ingle will reveal that his influence extends outside his own department, to Dr. Svanold, the Clinical Pharmacist, and to Dr. Kalms, the anesthetist with whom he works in PACU. He can reveal that Dr. Kalms is dissatisfied with the adverse effects of Toradol, an obvious opportunity for Vioxx.

All Dr. Ingle's colleagues can reveal that the representative for Celebrex has approached him seeking upgrade to the formulary status of Celebrex. If the representative asks Dr. Ingle about this, he will reveal his uncertainty about Celebrex, having recently seen sulfa-type allergies in two of his patients receiving Celebrex. The representative should ask Dr. Ingle to ensure these adverse events are reported in the *Adverse Event Alert*.

Most importantly for the representative, Dr. Ingle can write a *Preferred Status Request Letter*, but the representative needs to return a second time to obtain it.

The Chief of Orthopedic Surgery, Dr. Moran, is a "traveling lecturer" and is sponsored by several companies to chair various national and international symposia. She delegates the running of the department to Dr. Ingle in her absence. Dr. Moran is important since like Dr. Ingle, she can write a *Preferred Status Request Letter*.

Dr. Moran believes that Vioxx cannot be used for more than 5 days in patients with acute pain and therefore thinks that the long term safety of Vioxx cannot have been established. The representative should address this misconception and discuss the data on the long-term safety profile of Vioxx.

Confidential - Subject To Protective Order

MRK-AAR0049774

Previously, Dr. Moran was a formulary sponsor for Vioxx. She is therefore an obvious choice to ask to write a letter to Pharmacy seeking upgrade to the formulary status of Vioxx. If the representative asks Dr. Moran to support an application for preferred status on formulary for Vioxx, she will tell the representative that she would firstly need to know what the Rheumatologists (particularly Dr. Randolph) think, since they are the thought leaders on NSAIDs in the hospital.

The representative will have found out from Pharmacy that Dr. Randolph prescribes Celebrex. Thus, the representative is faced with a dilemma; Dr. Moran's request for upgrade to the formulary status of Vioxx is dependent on support from Rheumatology, yet Dr. Randolph, Chief of Rheumatology, prescribes Celebrex.

One solution to this problem, if Dr. Randolph is resolute in his support for Celebrex, is to seek support from another senior Rheumatologist. The representative should eventually discover that the best choice is Dr. House, Attending Physician (and P & T Committee member) in Dr. Randolph's team.

Dr. Peters, the other Resident in Orthopedic Surgery, thinks that studies show there is a faster onset of action in OA pain with Celebrex than with Vioxx. The representative needs to clarify the basis of this belief and review the clinical studies that show an onset of action of Vioxx 50 mg in 45 minutes. Though Dr. Peters has little prescribing autonomy, he can reveal important information about his colleagues in the department.

Dr. Zagni is the third-year resident in Orthopedic Surgery who has a special interest in trauma. She will ask the representative why she has to discontinue Vioxx post-operatively. The representative needs to clarify her question, and review the data that shows that Vioxx has no effect on platelet aggregation.

Dr. Zagni recently arrived from ER and will casually drop this information into the conversation. This should prompt the representative to probe Dr. Zagni for any information relating to the use of Vioxx in Emergency Medicine.

Since Emergency Medicine is a target department for Aggrastat too, the representative should probe for any relevant information relevant to Aggrastat, with a view to passing it on to his/her colleague who promotes Aggrastat.

Confidential - Subject To Protective Order

MRK-AAR0049775

Dr. Zagni will recall the day that she and Nurse Munson had to deal with an intra-cranial bleed in a patient being treated with Integrilin. Dr. Zagni can reveal that the Attending Physician in ER, Dr. Orlowski, is very keen to initiate GP IIb/IIIa platelet inhibitors in their UA patients, but that the Chief, Dr. Avery, will not allow this until an *Unstable Angina Protocol*, approved by Cardiology is in place. This information will enable representatives for Aggrastat to refine the focus of their strategy for Aggrastat.

The ideal way to approach Orthopedic Surgery is to be mindful of Dr. Moran's previous role as formulary sponsor for Vioxx and assess his current attitude towards it. Dr. Moran will agree to write a letter as long as the representative can show that the Rheumatologists too are in agreement. The representative needs to gain support from Rheumatology and call back to Dr. Moran and ask for a letter.

The representative should have found out from Pharmacy and Dr. Ingle's colleagues that he is likely to agree to write a letter. A convincing detail will secure a letter from Dr. Ingle. Other issues to address are each physician's misconceptions about Vioxx, the potential encroachment of Mobic, and the threat from the activity of the representative for Celebrex.

Dr. Moran — Dr. Ingle — Dr. House — Dr. Moran —

*Dr. Moran and Dr. Ingle can write Preferred Status Request Letters.*

### Emergency Medicine (Vioxx)

The physicians in Emergency Medicine prescribe a wide range of analgesics, including agents that specifically inhibit COX-2. Dr. Avery, Chief of Emergency Medicine, acted as a formulary sponsor for Vioxx and continues to be a Vioxx (and Celebrex) prescriber.

Dr. Avery will express concerns about the safety of Vioxx compared with Celebrex. The representative needs to address these concerns and uncover the fact that there is something of a whispering campaign at work in Emergency Medicine against Vioxx.

Confidential - Subject To Protective Order

MRK-AAR0049776

If Dr. Avery's concerns are addressed satisfactorily, he will agree to continue prescribing Vioxx. If the representative asks for his support for upgrade to the formulary status of Vioxx, he will say that he will think about it; if the representative presses him on this, he will tell the representative to call back and see him at a later time, and that in the meantime, the representative could always speak to Nurse Munson about it. This is a false lead, because letters are only acceptable from physicians of at least Attending Physician designation. Moreover, there is no second call with Dr. Avery (or any other Physician in Emergency Medicine) for the Vioxx part of the simulation.

The Fellow in Emergency Medicine, Dr. James, is new to the department and is thus an unknown entity to the representative. He likes the idea of agents that specifically inhibit COX-2 but will not prescribe Vioxx any more because he has read it is associated with an increased risk of heart attacks.

Dr. James is unhappy about the use of Vioxx in the department and has started voicing strong concerns about its safety to his colleagues. This is why he is willing to support an application for Celebrex as the preferred agent that specifically inhibits COX-2, as it may mean stopping use of Vioxx. While Dr. James comes across as a charming physician, he is the representative's biggest enemy in this department.

Dr. James' views have not yet had direct affect on prescribing but it has planted doubts in the minds of his colleagues: a significant threat to Vioxx.

One of the key players in this department is the senior trauma nurse, Nurse Munson. Having the ear of Dr. Avery, she is highly influential in the department. She initiated a patient follow-up program for patients taking analgesics for acute pain; it has shown Vioxx to be a well-tolerated and effective agent for the relief of acute pain.

Dr. James' negative views of Vioxx are threatening her follow-up program, and contradict her excellent clinical experience with Vioxx. She will agree to persuade Dr. James of the good safety profile of Vioxx.

Dr. Orlowski, is the ambitious young Attending Physician in Emergency Medicine. If probed by the representative he will reveal that on Dr. Ingle's request, he prescribes Vioxx in selected trauma patients being referred to Orthopedic Surgery. Dr. Orlowski does not like the power that Nurse Munson wields. The representative will be aware of this personality clash and should be sensitive when referring to Nurse Munson's outpatient follow-up program. Dr. Orlowski prescribes Celebrex in outpatients, and representatives will not be able to change this.

Confidential - Subject To Protective Order

MRK-AAR0049777

Dr. Payne, a Resident in Emergency Medicine, will agree to continue prescribing Vioxx if the representative answers his concern about the safety of Vioxx.

Dr. Treveena, the other Resident in Emergency Medicine, will agree to continue prescribing Vioxx if his concerns about the safety of Vioxx are addressed. If he is probed, he can reveal that one of the physicians in Oncology is a big prescriber of agents that specifically inhibit COX-2.

The ideal approach for the representative for Vioxx in Emergency Medicine is to act on the fact that Nurse Munson is seen by her colleagues as running the department, and call on her first. This call should provide the first clue that there is a potentially damaging whispering campaign, being lead by Dr. James, evolving in the department.

The representative needs to target the source of this campaign by calling on Dr. James next, and use the appropriate clinical reprints to convince him of the good safety profile of Vioxx. Finally, the representative should call on each of the other physicians in the department to demonstrate the good safety profile of Vioxx, and probe for any relevant information.

Nurse Munson — Dr. James — Dr. Avery — Dr. Orlowski — Dr. Payne — Dr. Treveena

*No one in Emergency Medicine can write a Preferred Status Request Letter, but support can be gained.*

## Emergency Medicine (Aggrastat)

Of the six individuals in Emergency Medicine, three — Dr. Avery, Dr. Orlowski and Nurse Munson — play an important role in the promotion of Aggrastat. The three remaining physicians, Dr. James, Dr. Payne, and Dr. Treveena, are only available for one call, and are information-givers rather than decision-makers.

The representative should notice Dr. Payne and Dr. Treveena's lack of understanding of the risks associated with thrombus formation and the role of GP IIb/IIIa platelet inhibitors in reducing the risk for coronary events, and educate them accordingly.

Both Dr. Payne and Dr. Treveena can give a good lead for Aggrastat, namely, that one of the physicians from Cath Lab, Dr. Killary, is "always down" in Emergency Medicine taking care of ACS patients with Dr. Avery. In addition, Dr. Treveena can reveal that Dr. Orlowski has complained about the fact that Emergency Medicine does not initiate GP IIb/IIIa platelet inhibitors.

*Roleplayer's Guide, Instructions*

24

Confidential - Subject To Protective Order

MRK-AAR0049778

Dr. James, the Fellow, can add nothing to information gained from calls to Dr. Payne and Dr. Treveena. However, he will make a comment about heart attacks and Vioxx. If the representative probes about this, it will become clear that he is having a potentially negative influence on the prescribing of Vioxx in Emergency Medicine. The representative for Aggrastat needs to communicate this to the representative for Vioxx.

The representative will have to call on Dr. Avery twice in order to ensure that Aggrastat is assessed in Emergency Medicine. While he does have the authority (as Chief of Department) to initiate GP IIb/IIIa platelet inhibitors, he is very concerned about safety issues, specifically bleeding problems. He will ask two questions about this in the call, and only if the representative probes, will he reveal the IC bleed that occurred a few months ago in association with the administration of Integrilin. Dr. Avery will not initiate GP IIb/IIIa platelet inhibitors until a protocol, devised by cardiology, is in place.

At the end of the first call, Dr. Avery will agree to trial Aggrastat provided that the Cardiologists supervise its use.

The representative will also have to call twice on Dr. Orlowski, the Attending Physician in Emergency Medicine. He is also concerned about bleeding problems, but thinks that GP IIb/IIIa platelet inhibitors should be initiated as soon as heparin is started. Dr. Orlowski is therefore an ideal champion for Aggrastat but is being held back by Dr. Avery's need for a formal protocol.

Dr. Orlowski will reveal that Dr. Avery calls in Dr. Killary, an Attending Physician from the Cath Lab to manage emergency ACS patients. At the end of the first call, Dr. Orlowski will agree to trial Aggrastat provided that the Cardiologists supervise its use. In a second call with Dr. Orlowski, he will hint that Dr. Omey, Director of Cath Lab, is still not convinced of the need for initiation of GP IIb/IIIa platelet inhibitors in Emergency Medicine.

Nurse Munson, the Senior Nurse Practitioner in Emergency Medicine will state that the nurses in the hospital are already very stretched without having to worry about a "new and complicated drug like Aggrastat". The representative must address these concerns, in both the first and second call, since she not only has the ear of Dr. Avery, but she is also heavily involved with the administration of drugs in her department.

In a second call Nurse Munson will reveal that the Nurse Coordinator, Nurse Kildaire has called in to ask about her experience of administering Aggrastat.

Confidential - Subject To Protective Order

MRK-AAR0049779

Nurse Munson can confirm that Dr. Killary is the main link with Cath Lab, and can reveal that Dr. Hartley is the main link with CCU.

The ideal approach for the representative for Aggrastat in Emergency Medicine is to call on all members of the department once to gather information and to identify the three key players: Dr. Avery, Dr. Orlowski, and Nurse Munson.

The representative should probe about the links that exist with Cardiology and the general attitude about GP IIb/IIIa platelet inhibitors that prevails in Emergency Medicine and Cardiology.

At the end of a first call with Dr. Avery and Dr. Orlowski, the representative will have discovered that a serious adverse effect associated with Integrilin occurred in their department. Concerns about safety have made Dr. Avery very hesitant about initiating GP IIb/IIIa platelet inhibitors in the emergency room. However, at the end of the first call, Dr. Avery and Dr. Orlowski will agree to trial Aggrastat, as long as the Cardiologists supervise its use.

The purpose of a second call with Dr. Avery, Dr. Orlowski and Nurse Munson is to check that they have kept their commitment to trial Aggrastat. The representative will need to answer any additional questions they have, overcome any objections that arise, and offer more reassurance about the safety profile of Aggrastat, particularly to Dr. Avery. Finally, the representative must ensure that trial use continues until an *Unstable Angina Treatment Protocol* is in place.

### Rheumatology

The Rheumatologists are seen as the thought leaders on NSAIDs in Memorial Hospital.

Dr. Hannah is a reserved and conservative Attending Physician in Rheumatology. He thinks that agents that specifically inhibit COX-2 are not "tried and tested" and he cannot be persuaded otherwise. The representative should answer Dr. Hannah's question about the dose of naproxen in a study that compared Vioxx with naproxen. If the representative ends the call positively by "leaving the door open", Dr. Hannah will reveal that Dr. Randolph only sees representatives in the afternoon.

Dr. House, is a cautious and ethical Attending Physician in Rheumatology. Importantly, she is on the P & T Committee. She is an independent thinker and is able to make considered decisions.

Confidential - Subject To Protective Order

MRK-AAR0049780

She will ask the representative about the use of Vioxx in patients taking warfarin, having just received a letter about Celebrex and warfarin. If the representative answers her question, Dr. House will reveal that of agents that specifically inhibit COX-2, she thinks Vioxx is the superior one. If probed further, she will state that she has performed trials on both Vioxx and Celebrex and that she is now convinced that Vioxx is obvious first-line choice.

There is no reason why immediately the representative should not ask Dr. House to write a *Preferred Status request Letter* for Vioxx. Dr. House will agree, as long as the representative is able to make a good pharmacoeconomic case for Vioxx as preferred agent that specifically inhibits COX-2 in their next visit to her.

Dr. Lee, the Resident in Rheumatology, does not respond well to what she describes as "pushy" representatives. Dr. Lee is not well-informed about the prescribing patterns in her department, and will give misleading information about her colleagues.

She will ask the representative when she should prescribe Vioxx 12.5 mg, 25 mg or 50 mg once daily, and if the representative answers her question well, and has adopted his or her selling style so that it is not "pushy", she will reveal that Dr. Randolph is very difficult to see.

Dr. Mason is a Fellow in Rheumatology who has a special interest in the pathogenesis of rheumatoid arthritis. He will ask the representative why he should prescribe Vioxx instead of Celebrex, when there is no difference between the two agents, except that Celebrex has a rheumatoid arthritis indication. If the representative convinces Dr. Mason that Vioxx is the superior agent for the treatment of acute pain, he will reveal that he thinks Dr. House is convinced of its superiority.

If the representative asks Dr. Mason about his area of special interest, he will respond that it is an area in which Dr. Randolph is interested too. If the representative probes further on this topic Dr. Mason will reveal that Dr. Randolph prescribes Celebrex for acute pain. Dr. Miles is the other Fellow in Rheumatology. He is a very friendly, disorganized physician who has little power in the department. He will ask the representative if Vioxx can be prescribed in patients taking low dose aspirin. If the representative answers his question, Dr. Miles will reveal that he prescribes Celebrex because Dr. Randolph prescribes it. This, along with Dr. Miles' obviously disorganized working style, should alert the representative that Dr. Miles is probably not the best physician with whom to pursue upgrade to the formulary status of Vioxx.

Confidential - Subject To Protective Order

MRK-AAR0049781

Dr. Miles will readily agree to see the representative in a second call. It would be foolish of representative to call back on this physician, and he will deliberately waste their time talking about his last vacation.

Dr. Randolph, Chief of Rheumatology, only sees representatives in the afternoon (this information can be revealed by his colleagues). Dr. Randolph prescribes Celebrex almost exclusively for outpatients. If the representative uncovers this, and points out that upgrading the formulary status of Vioxx will not affect his prescribing of Celebrex, he will back down and agree not to object to upgrade to the formulary status of Vioxx at P & T Committee meetings. The representative cannot change Dr. Randolph's intention to continue prescribing Celebrex for outpatients.

An ideal approach for the representative for Vioxx in Rheumatology is to call on Dr. House first. She will agree to write a letter for Vioxx as long as the representative makes as good pharmacoeconomic case for it. Next, the representative should call on Dr. Mason. She will not only agree to prescribe Vioxx first-line, but will also confirm that it is worth pursuing Dr. House to write a letter.

Then, the representative should call on Dr. Randolph to explain how upgrade to the formulary status of Vioxx will not affect his prescribing of Celebrex. Finally, the representative should return to Dr. House, present a good pharmacoeconomic argument for Vioxx ask for the letter.

Dr. House — Dr. Mason — Dr. Randolph — Dr. House

*Dr. House can write a Preferred Status Request Letter.*

## Endocrinology

One of the biggest potential uses for Vioxx in Endocrinology is to treat pain resulting from vertebral fractures associated with osteoporosis, which occur in the context of the menopause, secondary to diabetes, or corticosteroid use.

Mr. Andrews is a friendly Physician Assistant in Endocrinology and will open the call by discussing his hobbies. Then he will ask the representative about his or her own hobbies. It will be very difficult to get him to focus on the business call; only representatives who can make a smooth transition will succeed in shifting the conversation to the management of pain in the department.

Confidential - Subject To Protective Order

MRK-AAR0049782

Representatives that take control of the call without being overbearing will be given an important lead about potential business for Vioxx in the department, namely, that Dr. Sholing, the Attending Physician, is the person to speak to about analgesia.

Dr. Guidry is Chief of Endocrinology and a member of the PAT Committee. There will be a hint on the Participant's Card that she does not like being "interrogated" by medical representatives. In the call, Dr. Guidry will "close up" if the representative probes too much, a fact that representatives should pick up early in the call. She will become more communicative if representatives adapt their selling style to Dr. Guidry's own style, which is analytical and methodical.

There are three issues to be addressed with Dr. Guidry. Firstly, she believes there is no difference between Vioxx and Celebrex, secondly that Mobic is an agent that specifically inhibits COX-2 and offers attractive cost savings over Vioxx, and finally, that Dr. Randolph has sought her support for an upgrade to the formulary status of Celebrex.

The representative should address the Mobic issue quickly and tactfully. Then, the representative needs to differentiate between Vioxx and Celebrex and show why Vioxx should be the first choice agent that specifically inhibits COX-2 for the management of acute pain. Not believing there is a difference between Vioxx and Celebrex (and the fact the Dr. Guidry has a special interest in hormone replacement therapy) should suggest that Dr. Guidry is not a big prescriber of analgesics. If the representative probes on this, Dr. Guidry will direct the representative to Dr. Sholing, stating that he is more involved with decisions about analgesics in the department, and also consults with Dr. Helmann (Pain Clinic) about patients with chronic pain.

There is still the issue of Dr. Randolph's request for support for upgrade to the formulary approval of Celebrex. Dr. Guidry's deferral to Dr. Sholing provides the representative with ammunition for the fight against Dr. Randolph. The representative therefore needs to call on Dr. Sholing, reinforce the superiority of Vioxx, gain his backing for upgrade to its formulary status, and return with this information to Dr. Guidry. Having such a strong advocate of Vioxx in her own team, will ensure that Dr. Guidry does not block moves to upgrade its status at PAT Committee meetings.

Dr. Hickman (Oncology) very occasionally contacts Dr. Guidry for advice on patients with pituitary tumors. Only he can reveal that Dr. Guidry responds badly to what she sees as "interrogation" by pharmaceutical representatives.

Confidential – Subject To Protective Order

MRK-AAR0049783

Dr. Kattering is a Fellow in Endocrinology. He occasionally uses Celebrex for the treatment of acute pain, believing that Vioxx has no significant advantages over naproxen, whereas Celebrex does. If Dr. Kattering's concerns are addressed satisfactorily, the he will reveal that Dr. Sholing (the Attending Physician in Endocrinology) influences Dr. Guidry, an important piece of information since Dr. Sholing has a positive attitude towards Vioxx.

Dr. Sholing is probably the most important physician in this department. He previously agreed to give support for a formulary application for Vioxx on the condition that the representative persuaded Dr. Tang (Internal Medicine) to act as a sponsor for Vioxx. It appears, therefore, that Dr. Sholing is a supporter of Vioxx. However, the representative needs to find out that Dr. Sholing is inclined to niche Vioxx as a second line agent after conventional NSAIDs in NSAID-intolerant patients with pain due to vertebral fractures. This is an opportunity for the representative to expand the use of Vioxx in Endocrinology.

Dr. Wiltz, the Resident in Endocrinology, is suspicious of pharmaceutical representatives and is fearful of being "caught out". If the representative succeeds in putting Dr. Wiltz at his ease, he will reveal that Dr. Guidry is considering using Mobic instead of an agent that specifically inhibits COX-2. There is a twist in the call with Dr. Wiltz, however, because like Dr. Guidry, he too believes that Mobic is an agent that specifically inhibits COX-2. On the condition that the representative deals tactfully with this misunderstanding, and avoids making Dr. Wiltz feel that he has been "caught out", he will agree to prescribe Vioxx in NSAID-intolerant patients.

The approach to take in Endocrinology is to call on Dr. Guidry first and find out that Dr. Randolph is lobbying her for support for an upgrade to the formulary status of Celebrex. Dr. Guidry will direct the representative to Dr. Sholing. If Dr. Sholing's support for Vioxx can be gained, the representative can return to Dr. Guidry to seek her support at PAT Committee level for upgrade to the formulary status of Vioxx. The other members of the department can reveal useful information if they are probed by the representative.

Dr. Guidry — Dr. Sholing — Dr. Guidry

*No one in Endocrinology will write a Preferred Status Request Letter but support can be gained.*

Confidential - Subject To Protective Order

MRK-AAR0049784

*Internal Medicine*

Dr. Griffiths is the Chief Resident in Internal Medicine. She is guided in her prescribing by Dr. Tang, the Attending Physician in the department. Dr. Griffiths has a question about the hepatic effects of Vioxx, and if the representative answers this question satisfactorily, she will reveal that Dr. Jackson prescribes Celebrex for pain in NSAID-intolerant patients. This information, and the information Nurse Hardy reveals, will allow the representative to prepare his or her approach for a call with Dr. Jackson. If the representative presents a good argument for Vioxx, and uses the appropriate clinical reprints, Dr. Griffiths can agree to prescribe Vioxx first-line for patients with acute pain.

Nurse Hardy is the self-styled "gatekeeper" in Internal Medicine. She thinks representatives are a necessary evil and tries to protect the "over-worked" Dr. Jackson by vetting representatives in the sales call. Only representatives that meet with her approval, and do a convincing detail on Vioxx, will open the door to Dr. Jackson. If the representative answers Nurse Hardy's question about Vioxx, and skillfully probes her, she will reveal that Dr. Jackson prescribes Celebrex for pain in NSAID-intolerant patients because he is concerned that the rate of ulceration increases over time with Vioxx.

Dr. Jackson, a widely-published expert on eradication of *H. pylori*, is Chief of Internal Medicine. His favorite theme is GI mucosal protection, a fact that Nurse Hardy can reveal. If the representative addresses his concern about Vioxx, he will reveal that he takes his guidance on NSAID use from the Rheumatologists, the thought leaders on NSAIDs in the hospital. With further probing, Dr. Jackson will say that Dr. Randolph favors Celebrex, and he will then pose the question "Dr. Randolph can't be wrong, can he?".

The representative should recognize that Dr. Jackson's statements about the Rheumatologists crystallize both an opportunity and a threat for the prescribing of Vioxx. On the one hand, Dr. Randolph's influence is blocking prescribing of Vioxx by Dr. Jackson. A more serious implication of Dr. Randolph's influence relates to formulary status of Vioxx; like Dr. Randolph, Dr. Jackson is a member of the PAT Committee and could be persuaded by Dr. Randolph to vote against Vioxx (and for Celebrex) with respect to upgrade to its formulary status. On the other hand, the representative has the opportunity to approach another Rheumatologist, one who is in favor of Vioxx, and use this influence to persuade Dr. Jackson to sway in favor of Vioxx.

Confidential - Subject To Protective Order

MRK-AAR0049785

Dr. Tang, is interested in bone disease, and is firmly convinced of the superiority of Vioxx over Celebrex. If the representative answers Dr. Tang's question about the OUTCOMES study, Dr. Tang will reveal that he has prescribed Celebrex but did not consider it to be as effective as Vioxx.

If the representative probes Dr. Tang about his work with Dr. Sholing (Endocrinology) he will reveal that Dr. Sholing is the key physician to see about Vioxx in Endocrinology. If the representative probes Dr. Tang about his work with Dr. Helmann in the Pain Clinic, he will give a lead (albeit a vague one) about a new Attending Physician in Oncology. The representative should realize that Dr. Tang is a powerful champion for Vioxx and should ask him to lobby for Vioxx by explaining to Drs. Jackson, Sholing and Helmann why he favors Vioxx instead of Celebrex. Dr. Tang can agree to persuade Dr. Jackson that of agents that specifically inhibit COX-2, Vioxx should be the preferred agent.

The best route to take in Internal Medicine is to call on Nurse Hardy first. Nurse Hardy will then recommend that Dr. Jackson see the representative. Then, the representative should call on Dr. Griffiths, who will reveal that Dr. Jackson prescribes Celebrex. Dr. Jackson will indicate that the representative needs to gain the support of a Rheumatologist, specifically Dr. Randolph, who is not a supporter of Vioxx. If the representatives pick up on the fact that it is the Rheumatologists, and not just Dr. Randolph in particular, that Dr. Jackson respects, he or she can return with the seal of approval of Dr. House, a Rheumatologist and also a member of the PAT Committee.

Nurse Hardy — Dr. Griffiths — Dr. Jackson — Dr. Tang — Dr. Jackson

*No one in Endocrinology will write a Preferred Status Request Letter but support can be gained.*

## Anesthesiology

Anesthesiology is a large department in which the physicians specialize in one of three areas: pre-surgery care, post-anesthesia care (in PACU), and pain medicine (in the Pain Clinic). Despite their distinct areas of expertise, the physicians form an integrated team, and work closely together and influence each other.

Drs. Kalms (Chief), Settle (Fellow) and Stevens (Resident), specialize in post-anesthesia care. Dr. Dafoe, an Attending Physician, specializes in pre-surgery care. Drs. Helmann (Attending Physician), O'Mara (Resident) and Nurse Berger (Senior Nurse Practitioner) are the pain management specialists in the department.

Confidential - Subject To Protective Order

MRK-AAR0049786

Nurse Berger will express concerns about the long-term safety of Vioxx. If the representative addresses these concerns, she will state that she prescribes Vioxx first-line in patients with moderate acute pain. If she is asked to identify which physician in her department is most like to write a letter in favor of Vioxx, she will suggest or Dr. Helmann or Dr. Kalms. Nurse Berger can also agree to discuss with Dr. Helmann including Vioxx in Dr. Helmann's *Memorial Hospital Pain Management Guidelines* if it is upgraded to preferred status on formulary. The representative should pick up that this implies that Dr. Helmann has a positive attitude towards Vioxx.

Dr. Dafoe, an Attending Physician who specializes in pre-surgery care, has a question about the effect of Vioxx on platelets. If the representative deals with his question, he will agree to prescribe Vioxx in patients who are coming in for surgery. Dr. Dafoe is asked to identify which physician in her department is most like to write a letter in favor of Vioxx, he will suggest Dr. Kalms. Dr. Dafoe will also reveal that his colleague Dr. Settle has tried to persuade him to prescribe generically whenever possible — a hint that Dr. Settle might not be a good choice to approach for a letter for Vioxx.

Dr. Helmann is a highly respected pain management specialist who receives referrals from colleagues within the hospital and from surrounding centers. She is developing guidelines for the management of acute and chronic pain for patients in the hospital and the community — the *Memorial Hospital Pain Management Guidelines* — and has invited Dr. Dafoe, the pre-surgery specialist, to collaborate on the project.

Dr. Helmann will ask the representative about the head-to-head study comparing Vioxx with Celebrex. If the representative answers her question, she will reveal that she prescribes Vioxx first-line for patients with pain due to inflammation. This is the cue for the representative to ask Dr. Helmann to write a letter, but she will refuse, because she is too busy. Instead, Dr. Helmann will suggest the representative talks to Dr. Kalms, a hint that Dr. Kalms already prescribes Vioxx.

Dr. Kalms, a post-anesthesia care specialist, and Chief of the department, can write a *Preferred Status Request Letter* for Vioxx. He will ask the representative about the effect of Vioxx on bleeding time. If the representative addresses his concern, Dr. Kalms will reveal that he prescribes some Vioxx but a lot of Toradol and is unhappy with the side effects of the latter. Dr. Kalms can agree to prescribe Vioxx instead of oral Toradol and, if the representative asks, to write a *Preferred Status Request Letter* as long as the representative presents a good pharmacoeconomic case for Vioxx. The representative therefore needs to call back to Dr. Kalms to present the pharmacoeconomic case for Vioxx.

Confidential - Subject To Protective Order                                                      MRK-AAR0049787

The Participant's Card will state that Dr. Kalms is President of the APCA; no further hints, except that he thinks "laughter is the best medicine", are given to the representative.

Dr. Kalms is President of the American Physicians' Comedy Association (APCA), but only an Aggrastat target (Dr. Stanley, Cardiology) can reveal this information. Dr. Kalm's presidency of the APCA is relevant to the selling situation insofar as it reveals an aspect of his personality (a good sense of humor) and indicates the type of approach the representative should adopt with him. It is not directly relevant to the promotion of Vioxx.

Dr. O'Mara, the Chief Resident who specializes in pain medicine, has an interest in palliative care. As a way of fostering this interest, Dr. Helmann has encouraged Dr. O'Mara to start collaborating with the new attending physician in Oncology who specializes in palliative medicine, the innovative Dr. Vinca.

Dr. O'Mara will ask the representative about the half life of Vioxx, and if his question is answered satisfactorily, he will reveal that he reserves Vioxx for NSAID-intolerant patients. The representative therefore has the opportunity to expand the use of Vioxx into all patients with pain due to inflammation.

Dr. Settle, is a Fellow who specializes in post-anesthesia care. He is the acerbic, inscrutable type, who prescribes generically whenever possible. If the representative asks him about his area of special interest (patient-controlled analgesia), he will become more animated. He will ask a question about the use of Vioxx in patients with inflammatory bowel disease. Irrespective of whether the representative answers his question correctly, Dr. Settle will not agree to anything in the call.

Dr. Stevens is a Resident who specializes in post-anesthesia care. She thinks there is no difference between Vioxx and Celebrex, and asks the representative why she should prescribe Vioxx. If the representative sells the superiority of Vioxx, Dr. Stevens will agree to trial Vioxx in patients with post-operative pain.

An ideal approach for the representative for Vioxx in Anesthesiology is to call on Dr. Kalms because he is Chief of Department. If the representative does a good detail, he will agree to write a letter, but only as long as the representative shows the pharmacoeconomic case for Vioxx.

Next, the representative should call on Dr. Helmann, and assess her attitude to Vioxx. This is important because of Dr. Helmann's influence throughout the hospital. Dr. Helmann will reveal that she is prescribing Vioxx first-line but is unwilling to write a letter to Dr. Nettles.

Confidential – Subject To Protective Order

Finally, the representative should return with the pharmacoeconomic data to Dr. Kalms and he will write the letter.

*Dr. Kalms can write a Preferred Status Request Letter.*

Dr. Kalms — Dr. Helmann — Dr. Kalms

## Cardiology

Dr. Stanley is the stern, businesslike Chief of Cardiology who has overall responsibility for the Cath Lab and the CCU. His approval, which is required for adoption of any new treatment protocol or product, depends on recommendations from Dr. Omey, Director of Cath Lab, Dr. Jensen, Director of CCU, and Nurse Kildaire, the Nurse Coordinator. Dr. McKenzie, the Clinical Pharmacist, who prepares reviews of new drugs and management strategies and circulates them to the Cardiologists, also influences Dr. Stanley.

The representative needs to keep Dr. Stanley informed of his/her activities in the Cath Lab and CCU, as well as selling the benefits of Aggrastat.

The key physicians in the Cath Lab are Dr. Omey (Director) and Dr. Killary (Attending Physician). Dr. Killary is the only physician who can influence Dr. Omey (a fact revealed to the representative for Vioxx by Dr. Zagni, one of the orthopedic surgeons). The representative will have to call on both Dr. Omey and Dr. Killary three times.

Dr. Omey is resistant to the prescribing of GP IIb/IIIa platelet inhibitors in Emergency Medicine because he thinks they will limit the options open to him once the patient arrives in the Cath Lab. His negative attitude toward Aggrastat is clear from his first, apparently uncompromising, comment to the representative: "We prescribe ReoPro and we're happy with it. You don't have an indication for the Cath Lab." Dr. Omey's objection is therefore the biggest obstacle to Aggrastat in Memorial Hospital. If the representative does not overcome it, Aggrastat will not be adopted into an *Unstable Angina Treatment Protocol* and it will not routinely be prescribed in Emergency Medicine.

Nevertheless, Dr. Omey is convinced of the benefit of platelet inhibition since he prescribes ReoPro in high-risk ACS patients

Confidential - Subject To Protective Order

The representative needs to explain to Dr. Omey that he/she is not suggesting that Aggrastat substitutes ReoPro in the elective situation. Furthermore, he/she will have to convince Dr. Omey that any prescribing of Aggrastat will not impose limits on his options for PCI in the Cath Lab. Very convincing details, and the support of Dr. Killary, will persuade Dr. Omey to sanction the prescribing of Aggrastat in Emergency Medicine.

At the end of call three, Dr. Omey will agree to recommend to Dr. Stanley the inclusion of Aggrastat as the sole GP IIb/IIIa platelet inhibitor in an *Unstable Angina Treatment Protocol* for Emergency Medicine.

From the first call with Dr. Killary, it will be clear that she is more open than Dr. Omey to the initiation of GP IIb/IIIa platelet inhibitors in Emergency Medicine. The representative should have found out about the good working relationship between Dr. Killary and Dr. Avery and use it to reassure Dr. Avery about prescribing of GP IIb/IIIa platelet inhibitors in Emergency Medicine.

Dr. Killary will still need reassuring that the clinical data for Aggrastat supports its use in the Cath Lab.

Dr. Killary does not like the representative for Integrilin (only the Cath Lab Technician, Mr. Beckett can reveal this), a potential advantage for the representative for Aggrastat. Dr. Killary should be used to positively influence Dr. Omey. At the end of a third call, she will agree to meet with other senior Cardiologists to finalize an *Unstable Angina Treatment Protocol* for Emergency Medicine, in which Aggrastat is named as the sole GP IIb/IIIa platelet inhibitor. Dr. Hartley is the Attending Physician in CCU. She feels hampered by Dr. Jensen's conservative approach to drug therapy and patient management. Though she acted as a formulary sponsor for Aggrastat, she now feels neglected by Merck, and will ask: "How come you guys haven't been in to see me these last few months; am I not important to you any more?" If the representative deals tactfully with her question, and moves the call forward, Dr. Hartley will reveal that she occasionally prescribes Integrilin.

Dr. Hartley will challenge the representative to provide a sound argument for prescribing Aggrastat in high-risk UA patients. If the representative makes a good case for Aggrastat, and sells its advantages over Integrilin, Dr. Hartley will agree to assess Aggrastat in high-risk UA patients.

She will request examples of UA treatment protocols from other hospitals; this is a test of the representative's commitment to her. If the representative provides these example in a third call, Dr. Hartley will continue to prescribe Aggrastat; if not, she will revert to prescribing Integrilin.

Confidential - Subject To Protective Order

MRK-AAR0049790

The Director of CCU is Dr. Jensen, a weak-willed individual who bows easily to pressure from Dr. Stanley and Dr. Omey. Dr. Jensen is not a decision-maker, and the one piece of useful information he can reveal is that his colleague, Dr. Hartley, prescribes Integrilin. Though Dr. Jensen will encourage the representative to call back to him a second time, there is no other call available with him, and the representative should have figured out that time spent in a second call with him would be more fruitfully spent elsewhere.

Dr. Pole is the Fellow in CCU whom representative can call on twice. He works well with Dr. Hartley and Dr. Omey and can reveal useful information about their management of patients with ACS. He will also identify Dr. Hartley, rather than Dr. Jensen, as being the decision-maker in CCU.

Dr. Pole will state that he sees no difference between Aggrastat and Integrilin. If the representative clearly differentiates between the two agents, he will agree to positively influence Dr. Hartley.

In a second call, he will indicate that Dr. Omey is still not convinced about sanctioning the use of Aggrastat in Emergency Medicine. If the representative deals effectively with his objection about the dosing of Aggrastat, Dr. Pole will agree to continue to support Dr. Hartley in her prescribing of Aggrastat in high-risk UA patients admitted to CCU from Emergency Medicine.

Dr. Robbins is a Resident in CCU who recently rotated from Rheumatology. Her most useful contribution is her comment that "the AP in Rheumatology loves Vioxx". This comment will be triggered by any observation on the part of the representative for Aggrastat about her recent rotation from Rheumatology. This information should be communicated to the team for Vioxx since it identifies the strongest and most influential ally for upgrade to the formulary status of Vioxx (Dr. House, Rheumatology. The ideal approach for the representative for Aggrastat in the Cath Lab and CCU is call on all personnel once to gather information and establish their attitude toward the role of Aggrastat in the management of unstable angina in Emergency Medicine.

In Cath Lab, Dr. Omey and Dr. Killary are the key players. The other two individuals, Mr. Beckett the Cath Lab Technician, and Dr. Murphy, a Resident can provide useful information.

For the second and third calls in the Cath Lab, the representative should call on Dr. Killary before calling on Dr. Omey because Dr. Killary will provide information that the representative can use to prepare the call to Dr. Omey.

Confidential - Subject To Protective Order

MRK-AAR0049791

The final call in the Cath Lab should be to Dr. Omey because he will agree to recommend Aggrastat as the preferred short-acting GP IIb/IIIa platelet inhibitor on an *Unstable Angina Treatment Protocol* for Emergency Medicine to Dr. Stanley.

In the CCU, Dr. Hartley is the key player. There is the opportunity for the representative to persuade Dr. Hartley to switch from prescribing Integrilin to prescribing Aggrastat and to gain her support through her working relationship with Dr. Avery for naming Aggrastat as the sole GP IIb/IIIa platelet inhibitor in an *Unstable Angina Treatment Protocol*.

The last call in Cardiology should be to Dr. Stanley and the representative should request his approval for the *Unstable Angina Treatment Protocol*.

## Nursing

Nurse Kildaire is the only member of the Department of Nursing profiled. As Nurse Coordinator she conducts resource utilization audits that measure the time and consumables required for drug administration and monitoring. These measures are then added to the base drug cost to provide a true picture of the cost of a given drug.

Since Dr. Stanley (Chief, Cardiology) is under pressure to contain the costs of running his department, Nurse Kildaire's input is invaluable as it will demonstrate that Aggrastat is more cost-effective than Integrilin.

The representative must answer Nurse Kildaire's questions about the administration and monitoring requirements for Aggrastat. The representative must also explain the goal of protocol development so that she will carry out a resource utilization audit for Aggrastat.

Nurse Kildaire will ask the representative to call back a second time to clarify any questions she may have. Providing the representative follows up, Nurse Kildaire will agree to compare Aggrastat with historical data she has on Integrilin, and submit her finding to Dr. Stanley.

Dr. Stanley will only give final approval for inclusion of Aggrastat as the exclusive short-acting GP IIb/IIIa platelet inhibitor on an *Unstable Angina Treatment Protocol* for Emergency Medicine if he has received Nurse Kildaire's favorable report, as well as a recommendation from Dr. Omey.

Confidential - Subject To Protective Order

MRK-AAR0049792

## Oncology

Dr. DeVita, the Chief of Oncology is a businesslike but compassionate doctor who is a world-renowned expert on the treatment of lymphoma. Like all other heads of department, Dr. DeVita is being pressurized by Mr. Filan to contain the running costs of the department, especially with respect to its expenditure on drugs.

He will ask the representative a question about platelets. If the representative answers his question, Dr. DeVita will agree to trial Vioxx in a patient coming into clinic later in the day. If probed about a *Preferred Status Request Letter*, he will direct the representative to Dr. Vinca, since she is an expert on palliative care. He will state that he has asked Dr. Vinca to advise him and colleagues in the department about issues specifically related to palliation, including the management of pain.

Dr. Hickman is a fellow in Oncology. He is a long-serving member of the department and very loyal to the Chief. Dr. Hickman is conservative is his approach to prescribing and shies away from controversy. Though he lacks ambition, he is conscientious in his approach to patient care, especially the management of pain.

Dr. Hickman specializes in the management of endocrine tumors, and prescribes analgesics for patients with bone pain and headaches. He has a question about dosing of Vioxx and renal impairment. If the representative answers his question, Dr. Hickman will agree to trial Vioxx in patients with moderate acute pain.

Dr. Hickman jointly manages patients with Dr. Guidry, and if asked about this, he will also reveal useful information about the best approach to take with her. Dr. Hickman can also reveal that he refers to Dr. Sholing (Endocrinology) for advice on the management of pain, and that Dr. Sholing prescribes Vioxx.

Dr. Vinca is the new Attending Physician in Oncology. Recently arrived from the Sloan-Kettering Cancer Center, she is an expert in palliative care. The physicians in Oncology and other related specialties such as the Pain Clinic see her appointment to Memorial Hospital as a coup.

She is fast-talking, energetic, and innovative. She likes to be the person who asks the questions in sales calls, so representatives will need to work hard to take control of the call.

She shares an interest in palliative care with Dr. O'Mara, one of the anesthesiologists in the Pain Clinic; an interesting and important link for the representative to explore.

Confidential - Subject To Protective Order                                    MRK-AAR0049793

If the representative answers Dr. Vinca's question about the *JAMA* articles, she will reveal that she uses Vioxx in moderate pain. Further probing will reveal that she has never used Celebrex — she sees no need — because Vioxx is effective and well tolerated. If she is asked to write a letter, she will refuse because she thinks she is too new in the hospital. She will agree to continue using Vioxx, and to recommend its use to her colleagues in Oncology and the physicians in Anesthesiology.

Dr. Wineberg is a Chief Resident in Oncology who is hoping to specialize in head and neck carcinoma. He prescribes Vioxx and will refer to the fact that many of his patients have difficulty swallowing. The representative should use this as an opportunity to sell the suspension formulation of Vioxx.

An ideal approach for the representative for Vioxx in Oncology is to call on Dr. De Vita first. While he does not prescribe many analgesics, he is Chief of Department, and it is a good idea for the representative to pay a "courtesy" call.

Next, the representative should call on Dr. Vinca and assess her attitude to Vioxx. Dr. Vinca is clearly the most important physician in Oncology, with her influence already extending into Anesthesiology.

It is important for the representative to find out about the link between Oncology (Dr. Vinca) and the Pain Clinic (Dr. O'Mara) because it provides an opportunity to gain powerful support for Vioxx from the pain management specialists in the hospital.

Dr. De Vita — Dr. Vinca

*No one in Oncology can write a Preferred Status Request Letter but support can be gained.*

Confidential - Subject To Protective Order

MRK-AAR0049794