IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DALE SLATTON and GARY ALBRIGHT, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:05-CV-01056-VEH |
| | ) | Removed from the Circuit Court |
| MERCK & COMPANY, INC., et al., | ) ) | of Jefferson County, Alabama CV005-2316 |
| | ) ) | |
| Defendants. | ) | |

---

### PLAINTIFFS' REPLY TO MERCK'S OPPOSITION TO REMAND

---

Merck, a once proud, venerable company, is now under siege for engaging in conduct which was designed to, and did, risk the lives of thousands - perhaps hundreds of thousands - of people. In its opposition to remand, Merck continues the charade, blithely referring to the claims against its sales representatives as "untenable." Merck, like most pharmaceutical companies, faced a point in time where tension existed between the scientific department and the marketing department over Vioxx. The marketing department won, and what ensued became, over a brief five year period, both a profit bonanza and potential death knell for the company.

The more evidence that emerges regarding Merck's promotion of Vioxx, the worse it gets. In recent months, the captain of the ship for Merck while Vioxx was on the market, CEO Ray Gilmartin, resigned in disgrace. Congressional hearings have been held. The FDA has refused to allow the drug to be returned to the market. This week, internal documents were provided to the Associated Press which prove that as early as 2000, Merck was trying to seek a patent to reformulate the drug in an attempt to reduce the cardiovascular risks. This explosive revelation conflicts sharply with Merck's long standing mantra that it was unaware of the cardiovascular risks of the drug until the fall of 2004. A MSNBC article detailing the latest development is attached as Exhibit "A."

Merck's aggressive and well-trained sales force, including the Defendants herein, were vital to the scheme contrived by Merck to push the sales of Vioxx for years following the known cardiovascular risks of the drug. The sales force, including the Defendants herein, were the link between the company and the consumer, and were trained to ignore, downplay, or mislead physicians concerning the risks of the drug. These are not the musings of one plaintiffs lawyer. This is information which cannot be rebutted by Merck. These sales rep Defendants, with full knowledge of the dangerous

propensities of the drug, continued on this track of deception following admonitions from the FDA, as well as journal articles questioning the safety of the drug.

As referred to in the Motion to Remand, the United States House of Representatives Committee on Government Reform conducted an investigation into the manner in which Vioxx was marketed to physicians. This 29 page report speaks the truth as to the devious techniques employed by Merck sales representatives. Merck ignored this report in its opposition as though it did not exist.

Further, Plaintiffs provided this Honorable Court with the recent Remand Order by Honorable Scott Coogler in another Vioxx case, *Brenda Sue Landrum v. Merck & Co., Inc., et al.,* US District Court Northern District of Alabama, Civil Action No.: CV-05-01-055. Merck did not attempt to distinguish this case.

Because Merck fails to acknowledge the existence of the report prepared by the United States House of Representatives, we shall provide Your Honor with a brief overview of the report. The report is consistent with the allegations contained in the Plaintiffs' Complaint, and renders any claim by Merck that the sales representatives were fraudulently joined "untenable."

I. **THE ACTIONS OF THE DEFENDANT SALES REPRESENTATIVES WERE ATROCIOUS AND TANTAMOUNT TO A TORT UNDER ALABAMA LAW**

In its lengthy report dated May 5, 2005, the United States House of Representatives reviewed over 20,000 pages of "internal company documents, including course curricula, bulletins to the field, planning materials, company talking points, memoranda among senior executives, and promotional materials for use with physicians." ("The Marketing of Vioxx to Physicians", Exhibit D to Plaintiffs' Emergency Motion to Remand) The memorandum carefully referred to Merck internal documents, as well as FDA documents and journal articles. Indeed, the study has 134 footnotes. (While a copy of this report was provided previously, it is also attached hereto as Exhibit "B".)

Merck's own internal documents prove the claims against the sales representative Defendants. Below are some of the findings included in the report, with corresponding page numbers:

- **Drug Companies Spend Billions of Dollars Marketing to Physicians:** "Promotions targeting physicians account for the majority of drug industry spending on marketing and promotion. In 2003, pharmaceutical companies spent $9 billion on marketing and promotion. Of this amount, $5.7 billion (over 60%) was aimed at physicians. As many as 90,000 sales representatives meet with physicians about their

4

company's products every day. Vioxx was no exception. According to Merck, the company assigned over 3,000 company representatives across the country to engage in face-to-face discussions with physicians about Vioxx." (p. 6)

- **Merck did not Tell the Truth to Physicians about the Risks of Vioxx:** "In fact, the documents suggest that Merck's sales representatives did not appropriately educate physicians about the research showing Vioxx's cardiovascular risks. To the contrary, it appears that Merck's highly trained sales force was instructed not to address the new research findings, but to emphasize outdated and misleading data that indicated Vioxx was safer than alternatives. The documents thus raise serious questions about the role played by Merck's representatives in physician prescribing of a risky drug." (p. 7)

- **Merck's Sales Reps were Experts in the Art of Selling:** "Another section of the same course instructed representatives on where to sit and how to eat when dining with physicians. For example, the curriculum stated: 'bread should be eaten one small bite size piece at a time. Break off and butter bread one single piece at a time. Bread dipped in olive oil should also be broken off and eaten one single piece at a time.'" (p. 12)

- **Merck Sales Representatives Gave Physicians the Good and Ignored the Bad:** "Merck representatives were trained to use reprints of medical journal articles in sales discussions, but only when those articles presented Merck products in a favorable light. One course workbook instructed participants that medical journal articles relating to Merck drugs fell into two categories: 'approved' and 'background.' (p. 12)

- **To Increase Sales, Merck Purchased Prescribing Information from Outside Vendors:** "The documents reveal that Merck provided its representatives with highly detailed information on individual doctors prescribing habits, and this data was used to target physicians to increase their prescribing of Merck drugs. Merck purchased this prescribing data from an outside company, which obtained the data from pharmacy records of filled prescriptions. . . . [a]n important concept

was each doctor's 'Merck potential,' which Merck defined as a 'dollar estimate of each prescribers total prescribing volume that can realistically be converted to Merck prescriptions.' (p. 13)

- **As Early as 2000, Merck Implemented a Program Designed to Obfuscate the Results of a Study which Revealed Severe Cardiovascular Risks Associated with Vioxx:** 'Merck's meticulous approach to marketing to physicians is reflected in its communications to physicians about Vioxx and its risks. Beginning in March, 2000 a series of studies and news reports raised serious questions about the safety of Vioxx. The Merck documents reveal that the company gave its highly trained representatives detailed instructions for responding to these developments. These instructions had a common theme: reassure physicians about the safety of Vioxx while providing highly questionable information about cardiovascular risks. At the same time, Merck continued to use an array of incentives and messages to inspire its staff to market Vioxx aggressively to physicians." (p. 16)

- **Merck Employed the Use of a Sales Device Known as "Cardiovascular Card", which Contained False and Misleading Data, in an Attempt to Convince Physicians to Prescribe Vioxx:** "The cardiovascular card was a tri-fold pamphlet containing data that supported the safety of Vioxx. One panel, featuring the headline 'Overall Mortality Rates,' indicated that patients on Vioxx were eleven times less likely to die than patients on standard anti-inflammatory drugs, and eight times less likely to die from heart attacks and strokes. . . . [t]he data presented in the cardiovascular card appears to have little or no scientific validity. The card did not present actual numbers of events or any statistical test of significance, which are standard in medical communications. It also did not contain any information from the VIGOR study, the most recent study of cardiovascular safety in rheumatoid arthritis patients." (p. 18)

- **The FDA has Accused Merck of Providing False and Misleading Information to Physicians from the "Cardiovascular Card":** "When given the opportunity, FDA scientists have expressed 'serious concerns' about using the data summarized on the cardiovascular card to address cardiovascular safety. One FDA medical reviewer, in a briefing this

6

week with Committee staff, said that the relevance of Vioxx's pre-approval studies to the drugs cardiovascular safety was 'non-existent' and that it would be 'ridiculous' and 'scientifically inappropriate' to present mortality comparisons from these trials to physicians." (p. 19)

- **Following the Stunning Results of the VIGOR Study, the FDA Ordered Merck to Provide Physicians with the Uncontroverted Proof that Vioxx Posed Cardiovascular Risks, but Merck Ignored the FDA:** "Attention to the cardiovascular risks of Vioxx surged in February 2001 as a result of the meeting of the FDA Arthritis Advisory Committee. After FDA scientists raised serious concerns about the drug's safety, the Committee voted that doctors should be informed about the data from the VIGOR study. The next day, however, Merck instructed its sales representatives not to discuss the VIGOR results with doctors, and instead reassure physicians using the cardiovascular card." (p. 20)

- **Merck went to Great Lengths to Train its Sales Force to Avoid the Subject of Cardiovascular Risks, and to Re-focus the Physicians Attention on the False Data Contained in the "Cardiovascular Card":** "The next day, Merck sent a bulletin to 'all field personnel with responsibility for Vioxx.' The bulletin instructed the sales force to 'stay focused on the EFFICACY messages for VIOXX.' Contrary to the [FDA] Committee's recommendation, the bulletin advised: DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE . . . OR THE RESULTS OF THE . . . VIGOR STUDY. . . . [t]his position did not accurately reflect FDA regulations. Under the law, pharmaceutical representatives are permitted to discuss evidence of safety concerns with doctors, even if such data are not on the drug's label." (p. 22)

- **Even as Evidence of Cardiovascular Safety Began to Mount, Merck Stuck to its Message and Continued to Train the Sales Reps to Provide the False Data Contained on the Cardiovascular Card:** "In the case that a physician had further questions, Merck instructed the representatives to display the cardiovascular card. The bulletin told field staff to highlight data on the card suggesting that Vioxx might be much safer than other 'NSAIDS', non-steroidal anti-inflammatory drugs.

7

> Specifically, Merck advised representatives to state: 'Doctor, as you can see, cardiovascular mortality as reported in over 6,000 patients was Vioxx .1 vs. NSAIDs .8 vs. Placebo 0.' (p. 24)

The tactics employed by Merck and its sales force co-conspirators were deplorable. The company and the sales force acted in concert to conceal the true risks of Vioxx from physicians, and to provide false and misleading data which minimized the risks of the drug.

According to the US House of Representatives report, and as alleged consistently in the Complaint, the Merck sales rep Defendants had knowledge of the risks of the drug, and provided false and misleading information to physicians which was unwittingly passed along to patients.

Interestingly, in their so called "declarations", the sales rep Defendants do not deny that they received the training which was carefully articulated in the House of Representatives report. The sales rep Defendants do not deny that they were trained to dodge and mislead physicians regarding the risks of Vioxx. The sales rep Defendants do not deny that they provided the misleading data contained on the cardiovascular card to the Plaintiffs' physicians. The sales rep Defendants do not deny that they had knowledge of the cardiovascular risks associated with Vioxx as early as 2000 based on the results of the VIGOR trial. Instead, the sales rep Defendants consistently

state that the " . . . knowledge I had during my employment concerning Vioxx was provided to me by my employer." This statement surely proves that Merck provided false and misleading data to the sales force, and trained the sales force to use this misleading data in an attempt to enhance the sales of Vioxx, all of which the sales rep Defendants were happy to do in the name of increased bonuses and commissions.

### A. The "Learned Intermediary" Doctrine Indicts the Defendants.

Incredibly, by attempting to blame the Plaintiffs' prescribing physicians, the Defendants posit that their aggressive and immoral suppression of information about the drug's lethality creates a safe harbor against liability. They argue that their concealment of the dangers could have influenced only the prescribing physicians, who are "learned intermediaries." Defendants' Opposition at pp. 12-13. They blame the doctors for believing the "Big Lie" about Vioxx, namely that it posed no increase of cardiovascular risk. That position turns the doctrine of "learned intermediary" on its head. The doctrine imposed an unequivocal duty on Merck and its representatives to warn doctors of Vioxx's dangers, and "the adequacy of the warning is measured by its effect on the physician." *Walls v. Alpharma USPD, Inc.*, 887 So.2d 881, 883 (Ala. 2004) (*quoting Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307

(11th Cir. 2000) (brackets omitted)).

The illusion of safety conjured by the Defendants, versus the truth of the dangers, is the question. No advantage can be had on it by those who owed the duty to warn. No warning, which is the case here, perforce means no "adequate" warning, *Walls, ante*, and the duty is breached. Those are the effects of the "learned intermediary" doctrine. They indict the sales representatives, not absolve them.

B.  Rule 9(b) "Particularity" Does Not Support Removal.

Rather than face the merits of the claims against them, the sales rep Defendants invoke Rule 9(b) F.R.C.P. claiming that the fraud claims were not pled with particularity, and thus should be dismissed with prejudice.[1] Federal courts are loathe to dismiss complaints with prejudice even if they contain pleading deficiencies under Rule 9(b). *Hart v. Bayer Corp.*, 199 F.3d. 239, 247-48 n.6 (5th Cir. 1999) (even though Court believed fraud was pled in a conclusory manner, complaint should not be dismissed with prejudice to refiling). That principle applies to and defeats claims of fraudulent joinder. *Id.* at 248 (reversing trial court and ordering case remanded "to the state court

---

[1] While the sales rep Defendants have not framed their argument as a "dismissal with prejudice" of the Plaintiffs' fraud claim, the result of finding fraudulent joinder is the same as a dismissal with prejudice. In either case, the claims against the sales rep Defendants are dismissed with prejudice.

10

from whence it came"); *accord Rosamond v. Garlock Sealing Technologies, Inc.*, 2004 WL 1059811, *7-*8 (N.D. Miss. April 22, 2004) (failure to plead fraud with particularity was not a basis to deny remand) (attached hereto as Exhibit "C"). The three cases the Defendants rely on do not alter that conclusion. The cases bear no resemblance to this case.

In Wakefield, the federal district court held, 996 F. Supp. at 1221 (cited at Defendants' Opposition at p. 16), that the instant allegation of misrepresentation "understating the risks of tobacco smoking within the limitations period simply defies common sense." That judgment is a merits finding impossible to compare to the allegations and evidence here. *Compare Judson v. Nissan Motor Co.*, 52 F. Supp. 2d 1352, 1362 (M.D. Ala. 1999) (declining to follow *Wakefield*; granting motion to remand). In *United States ex rel. Clausen v. Laboratory Corp.*, 290 F.3d 1301 (11th Cir. 2002) (cited at Defendants' Opposition at pp. 16-17), the appeals court affirmed dismissal on the ground that the plaintiff failed to heed the trial court's repeated "admonishments to include more information about claims actually submitted." *Id.* at 1313; *see Hart*, 199 F.3d at 248 n. 6 (dismissal warranted only when "plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so"). There was no issue of removal and remand in

11

*Clausen*. The *Clausen* plaintiff simply failed to comply with multiple orders to correctly plead his action. Likewise, in *Mixon* (cited at Defendants' Opposition at p. 17), the Alabama Supreme Court affirmed dismissal because the plaintiff failed to carry her burden to toll the statute of limitations to prevent her claim from being time-barred. *Mixon v. Cason*, 622 So.2d 918, 920 (1993). There is no similar issue here.

If this Honorable Court sees fit to remand this case, then Merck will be free to pursue a motion to plead fraud with more particularity in the state court.

C.    The Florida Cases the Plaintiffs Cite Are On Point.

The Defendants fail to appreciate the relevance of the federal decisions from Florida that the Plaintiffs refer to. The decisions help reveal the true nature of this removal. In the most recent of them (*Tomlin*), the federal court decided that removal was improper in light of prior jurisdictional case law on the same or similar issue. The comparison is apt because the Plaintiffs base their motion to remand in pertinent part on the relevant body of case law in the Northern District of Alabama. The opinions in *Hales*, decided by Judge Acker, and in *Marchand* and *Landrum*, decided by Judge Coogler, are three such decisions, among dozens that are all virtually the same. Accordingly, the view

of the court in *Tomlin* (the culminating Florida case) is appropriate and relevant, as follows:

> [T]he Court notes that other, factually similar cases removed by Merck to federal court based on fraudulent joinder have been remanded. Merck attempts to distinguish these cases by arguing that, at the time they were remanded, no MDL had been requested. This attempt is disingenuous at best, and only serves to obscure the real issue before this Court of whether Merck should have removed this case based on fraudulent joinder in light of the prior remands in factually similar cases.

*Tomlin v. Merck*, Case No. 04-14335, slip op. at pp. 1-2, Feb. 22, 2005, U.S. District Court, S.D. Fla. (included in Exhibit "E" of Plaintiffs' Emergency Motion to Remand) (citations omitted).

The *Tomlin* court resolved the question precisely as this Honorable Court should resolve it, which would be to identify Merck's dilatory tactic and remand the case to the state court that possesses jurisdiction. *Tomlin*, slip op. at pp. 1-2 & 5.

## II. The Issue of Subject Matter Jurisdiction Should be Resolved by this Court Rather than Shifting the Issue to the MDL

The MDL Court in New Orleans is in no better position to adjudicate the issue of subject matter jurisdiction than this Court. Indeed, this Court must be guided by the Eleventh Circuit fraudulent joinder principles when deciding the remand issue. If the case goes to the MDL, the MDL judge will apply the

13

fraudulent joinder principles established by the Fifth Circuit. A MDL court applies the law of fraudulent joinder of the Circuit in which it is sitting. *See In re: Korean Airlines Disaster*, 829 F.2d 1171, 1174 (D.C. Cir. 1987).

Perhaps more importantly, Merck has not provided any reason why this Court should not be able to resolve, once and for all, the jurisdictional issue. This issue has been addressed time and time again by judges in the Northern District of Alabama. This Honorable Court is in a better position to decide whether the sales representative Defendants are fraudulently joined under the law of the 11th Circuit than Judge Fallon in New Orleans.

Further, asking this Court to defer consideration of the Motion to Remand on the basis of "judicial efficiency and consistent rulings", is not a practical solution. Judges in the Northern District of Alabama have already remanded some Vioxx cases. Some cases have been transferred to the MDL. No court in Alabama has denied remand. Thus, there is no evidence that this Court's decision, one way or the other, will lead to "inconsistent rulings" or "promote judicial efficiency." As with any mass tort, some cases wind their way through the state court system, and some get buried in a MDL. Vioxx is no different. Sending the jurisdictional issue to Judge Fallon will do nothing more than add another case to his already congested docket.

In fact, the real reason Merck desires this case to be sent to the MDL is for the purposes of delay. A prime example of delay is the case of *William Cook v. Merck,* US District Court for the Northern District of Alabama, **Civil Action No. 02-RRA-2710-S**. The *Cook* case, in which undersigned is co-counsel, was remanded to the Circuit Court of Jefferson County, Bessemer Division, on February 10, 2005, by Honorable Robert Armstrong. (Remand Order attached as Exhibit "D") However, since Judge Armstrong was not an Article III Judge, Merck had an opportunity to appeal his decision. In the interim following Judge Armstrong's ruling, MDL 1657 was formed, and the case was transferred to Judge Eldon Fallon in the Eastern District of Louisiana. Plaintiff filed a Motion to Adopt Judge Armstrong's ruling on April 15, 2005, with the Court in New Orleans. (Exhibit "E"). Judge Fallon has not ruled on the remand issue in the *Cook* case. In fact, Judge Fallon has not scheduled the remand issue for a hearing. The remand issues in all cases in MDL 1657 are going to be decided "as a group" at some point in the future. Hence, the *Cook* case, as with every other case where remand issues exist in MDL 1657, is in procedural limbo. Judge Fallon is extremely busy dealing with other issues in this MDL, such as the formation of fact sheets, the resolution of discovery disputes, and the attempt to schedule cases for trial. This Honorable Court

will be doing Judge Fallon no favors by asking him to resolve this jurisdictional dispute.

If Merck is convinced that the sales rep Defendants are fraudulently joined, then Merck should welcome this Court's adjudication of the jurisdictional issue.

_____
W. Lewis Garrison, Jr.
J. Callen Sparrow
William L. Bross
Attorneys for Plaintiffs

**_Of Counsel:_**
GARRISON SCOTT, P.C.
2224 1st Avenue North
Birmingham, Alabama 35203
(205) 326-3336
(205) 326-3332

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the above and foregoing with the Clerk of the Court on June 24, 2005, using the CM/ECF system, which will send notification of such filing to the following:

BRADLEY ARANT ROSE & WHITE LLP
Andrew B. Johnson
Fred M. Haston
F. Wendell Allen
Anne Marie Seibel
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203


Robert C. Brock
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
P.O. Box 270
Montgomery, AL 36101

_____
Of Counsel